EVANSTON FIREFIGHTERS ASSOCIATION, Local 742, Petitioner-Appellant, v. ILLINOIS STATE LABOR RELATIONS BOARD *et al.*, Respondents-Appellees.

First District (6th Division)   No. 1—90—2208

Opinion filed January 15, 1993.

Mark S. Stein and Daniel Koen, of Cornfield & Feldman, of Chicago, for petitioner.

Roland W. Burris, Attorney General, of Springfield (Ann Plunkett-Sheldon, Assistant Attorney General, of Chicago, of counsel), for respondent Illinois State Labor Relations Board.

John T. Weise and Sigismund L. Sapinski, Jr., both of Seyfarth, Shaw, Fairweather & Geraldson, of Chicago, for respondent City of Evanston.

Gregory J. Malovance and Steven E. Mitchel, both of Winston & Strawn, of Chicago, for *amicus curiae* Illinois Education Association.

Asher, Gittler, Greenfield, Cohen & D'Alba, of Chicago, for *amicus curiae* Illinois State Federation of Labor and Congress of Industrial Organizations.

JUSTICE EGAN delivered the opinion of the court:

The petitioner, the Evanston Firefighters Association, Local 742 (the Union), appeals from a decision of the Illinois State Labor Relations Board (the Board) which held that the issuance to all city employees of a memorandum by the respondent, City of Evanston (the City), regarding restrictions on the political activity of city employees did not constitute an unfair labor practice under the Illinois Public Labor Relations Act (the Act). Ill. Rev. Stat. 1989, ch. 48, par. 1601 *et seq.*

The City of Evanston had approximately 1,000 employees, 109 of whom were employed by the fire department. The City had a council-manager form of government, with a city manager, who was appointed by the city council, as the chief administrative officer. The city council was composed of 18 aldermen, who were elected in nine wards by popular vote within each ward.

The city manager managed the daily affairs of the City and served at the discretion of the city council. The city manager recruited and selected the administrative heads of the various departments, prepared and presented to the city council the City's budget, and made all hiring and firing decisions with respect to the City's employees. All department heads, including the fire chief, reported to the city manager. Nonsupervisory employees of the fire department were represented for the purposes of collective bargaining by the Un-

ion and formal collective bargaining had been conducted for the previous 20 years.

In early 1988, the members of the Union formed a political action committee (FIRE-PAC). The purpose of FIRE-PAC was to get the firefighters more involved in political issues that affected the terms and conditions of their employment. The Union's president informed the Union members of the formation of FIRE-PAC and that its goal was to "meet the need for sound political education and action among the members of Local 742." After pointing out several ways in which the committee could accomplish its objectives, the president advised the members that there were "some restrictions on political activity pertaining to the use of [their] positions with the [C]ity." Accompanying the letter were excerpts from the Illinois Municipal Code (Ill. Rev. Stat. 1987, ch. 24, par. 10—1—27.1), the bylaws of the Union and the City's personnel rules.

In 1988 and 1989, there were two issues of particular concern to FIRE-PAC. The first issue concerned the City's adoption of the "jump company," which was a new system for providing emergency medical assistance. The second issue involved the proposed closing of one of the City's five fire stations.

The "jump company" system was adopted by the city council in August 1988 and provided that four-man crews be assigned to both an ambulance and an engine. There were three such crews, each of which was assigned to a different section of the City. Under this system, the City was to purchase a third ambulance and do away with the central ambulance location. When a call for emergency medical assistance was received, the four-man crew responded directly with the ambulance, and no engine was dispatched. When a fire call was received, the crew "jumped" to the engine and responded to the fire.

Before the implementation of the "jump company" system, the fire department had two ambulances, each manned by two emergency medical technicians. These ambulances were located at a fire station in the central part of the City. Each of the other five stations operated engines that were assigned to a specific geographic area. Before August 1988, when a call for emergency medical services was received, the fire department dispatched an engine from the nearest station as well as an ambulance from the central location. If the engine got to the scene first, the firefighters on the engine provided any necessary life support services until the ambulance arrived. Once the ambulance arrived, the medical technicians took charge of the situation, and the engine was free to respond to other calls.

The second issue of concern to FIRE-PAC was a proposal, adopted by the city council in June 1988, to consolidate two existing fire stations located in the northwestern section of the City into one newly created station, resulting in the loss of one fire station.

The members of FIRE-PAC were opposed to the implementation of the "jump company" system and to the closing of one of the fire stations. The members believed that the "jump company" system would cause a delay in responses to both medical emergencies and fires. The members also believed that the elimination of one of the fire stations could cause even longer delays in response times and might also result in a reduction in force for the fire department.

In January 1989, FIRE-PAC polled the candidates for mayor and for city alderman in the April 4, 1989, general election. This poll sought the candidates' views on several issues, including the implementation of the "jump company" system and the consolidation of the two fire stations. Based upon personal interviews with the candidates and upon their responses to the poll, FIRE-PAC determined which candidates it would support in the April election. FIRE-PAC provided campaign contributions to those candidates who responded favorably to its poll.

FIRE-PAC decided to support candidate Richard Stillerman for alderman in the sixth ward and candidate Lester Anchenese for alderman in the seventh ward.

On the two weekends before the election, FIRE-PAC members engaged in a door-to-door canvass of residents in the City's seventh ward on behalf of Anchenese. The purpose of the door-to-door canvass was to hand out campaign literature on behalf of Anchenese and to inform the seventh ward residents of FIRE-PAC's position on the "jump company" system and on the closing of the fire station. Members who participated in the canvass were divided into groups of two and were instructed that they were not to identify themselves as city employees, but were to say that they were members of a political action committee affiliated with the Evanston Firefighters Association. The members who participated in the canvass were not dressed in their firefighter uniforms.

Members conducted a telephone canvass of the residents in the sixth ward on behalf of Stillerman. The telephone canvass was intended to accomplish the same objectives as was the door-to-door canvass in the seventh ward. Members participating in the telephone canvass were also instructed not to identify themselves as City employees.

On March 29, 1989, Joel Asprooth, the Evanston city manager, received a telephone call from a citizen, complaining that an individual, who had identified himself as a City employee, came to the citizen's home campaigning on behalf of a candidate for City office. The caller did not identify himself and could not name the individual who came to his door. Asprooth received another complaint that same day from an incumbent alderman, who stated that someone she knew had been approached by a City employee who came to his door.

Asprooth decided to issue a memorandum reminding all City employees that using their title or office during political activity was prohibited. On March 30, 1989, Asprooth sent a memorandum to all City employees along with their paychecks. The memorandum was as follows:

"This week I received a complaint that someone, who identified himself as a city employee, was calling on residents in their homes to encourage a vote for a particular aldermanic candidate. That person, if he is in fact a city employee, violated the Civil Service Ordinance, the Code of Ethics, and the Personnel Rules of the City of Evanston by using his official city office and title while engaging in political activity after working hours.

The Civil Service Ordinance and the Personnel Rules both contain the following provision:

'No employee of the City shall engage in political activity during working hours or while on City premises in any city-connected function, or use their official city office or title while engaging in political activities [after] working hours.'

The Code of Ethics provides that:

'No non-elective employee shall use the prestige of his position in behalf of any political party or for any political purpose.'

Each employee of the City is subject to these provisions. Violation of these restrictions on political activity is a very serious matter, and will result in disciplinary action. It is our obligation as public employees to avoid any appearance of political partisanship, and these ordinances and rules exist for that reason."

The Union filed before the Board a complaint which asserted that the memorandum constituted an unfair labor practice under section 10(a)(1) of the Act (Ill. Rev. Stat. 1989, ch. 48, par. 1610(a)(1)) because it interfered with the City employees' right to engage in "concerted activities not otherwise prohibited by law for *** mutual aid or pro-

tection" as guaranteed by section 6(a) of the Act. Ill. Rev. Stat. 1989, ch. 48, par. 1606(a).

The charge was investigated in accordance with section 11 of the Act (Ill. Rev. Stat. 1989, ch. 48, par. 1611), and the executive director of the Board issued a complaint for hearing. Following an evidentiary hearing, the hearing officer issued a recommended decision in which he found that the distribution of Asprooth's memorandum constituted an unfair labor practice in violation of section 10(a)(1) of the Act. Both parties filed exceptions to the hearing officer's recommended decision. The Board issued a decision which was contrary to the conclusion reached by the hearing officer. The Board dismissed the petitioner's complaint based upon its determination that the distribution of Asprooth's memorandum did not violate section 10(a)(1) of the Act.

We confess to having difficulty in delineating the issues before us. Before the hearing officer, the Union argued:

(1) It was engaging in concerted activity for the purposes of collective bargaining or other mutual aid or protection under section 6 of the Act.

(2) The City interfered with the right given the Union under section 6 and therefore was guilty of an unfair labor practice under section 10 of the Act.

(3) The legislature granted certain rights to public employees under section 6 unless those rights are "otherwise prohibited by law." The City's ordinance, rule and Code of Ethics[1] cannot be considered "laws" within the meaning of section 6.

(4) The City's ordinance is contrary to the provisions of section 10—1—27.1 of the Municipal Code (which the Union now concedes is not applicable).

(5) The City's ordinance is not consistent with the policies underlying the Federal Hatch Act, 5 U.S.C. §7321 *et seq.* (1988), and therefore violates the first amendment of the United States Constitution.

The City raised several arguments not raised here, *e.g.*, the statute of limitations. The City did not answer the Union's claim that the City's ordinance was not a "law" within the meaning of section 6.

The hearing officer noted that the parties had raised in their briefs the issues of whether the City's ordinance violated the Hatch Act, the Municipal Code and the United States Constitution. He said

---

[1]The ordinance and rule are the same. The City says the language of the Code of Ethics is to be construed the same as the pertinent provisions of the ordinance and rule. Consequently, we will refer only to the ordinance in the rest of this opinion except when referring to the findings of the hearing officer.

that those were not the issues as the case was presented at the hearing; he did not have jurisdiction to address such issues; and he would not consider them. He concluded that the Union's political activities were protected within the meaning of the Act and that the City's rule against the firefighters "using their City Office or title" encompassed their identifying themselves as a "City employee." He further held that the validity of that restriction was not relevant because neither party alleged that such activity took place or that the members of the Union ever intended to identify themselves as "City employees" or "firefighters." He also concluded that the provision of the Code of Ethics that no employee shall "use the prestige of his position" is ambiguous and might reasonably be interpreted as prohibiting the legitimate political activity of the members of FIRE-PAC. He held that such a broad restriction upon the political activity of a public employee can be reasonably interpreted to have a chilling effect upon the employee's exercise of protected activity. His ultimate conclusion was that the risk of ambiguity must be held against the promulgator of the code and that the City violated section 10(a)(1) of the Act by "threatening its employees with discipline if they violated a vague prohibition against political activity." Thus, the hearing officer decided in favor of the Union on a ground not urged by the Union.

Both parties filed before the Board exceptions to the hearing officer's report. The Union maintained that the Board should make clear that there is no distinction between legitimate and illegitimate protected concerted political activity. The City took issue with several findings of the hearing officer and for the first time argued that its ordinance came within the exception to section 6 which grants certain rights to employees "unless otherwise prohibited by law." The City identified the phrase "as the very crux of the case."

The Board held that the firefighters did engage in protected political activity but that the City demonstrated an overriding interest in prohibiting the firefighters from identifying themselves as City employees. The Board did not address the question of whether the phrase, "prohibited by law," included prohibitions by a municipal ordinance. Thus, the Board decided the case on a ground not raised by either party and did not pass on the principal ground that was raised by the City. The Board also passed on a question that was not before it with this observation:

> "The Hearing Officer apparently reasoned that because the employees in this case identified themselves as members of the Union rather than City employees, the City had no interest in prohibiting the activity. However, as the City points out in its

exceptions, the City's interest remained the same whether the employees engage in political activity using the name of an organization of public employees or their official titles. See *Wachsman v. City of Dallas*, (5th Cir. 1983), 704 F.2d 160. We see no substantial difference between identifying oneself as a City employee and identifying oneself as a member of an association of City employees."

We emphasize, as did the City, that the issue before the Board was whether the memorandum constituted an unfair labor practice. That is the same issue and only issue that is before us. The memorandum says nothing about employees identifying themselves as members of any organization. The hearing officer's findings may not be reasonably interpreted to mean that the hearing officer reasoned as the Board said he "apparently" did. The hearing officer did say that an issue in the case was "whether the political activity engaged in by FIRE-PAC is protected by the Act." But the hearing officer did not say that an individual's identification of his membership in FIRE-PAC was an issue. The City did not say that its interests remain the same "whether the employees engage in political activity using the name of an organization of public employees or their official titles." To the contrary, the City's exceptions made it clear that the City was addressing only the activities and representations of City employees and not members of FIRE-PAC. One of the exceptions was as follows:

"The memo did not address activities related to FIRE-PAC— it was addressed to all employees concerning the use of their city title. Again, the City did not argue the broader question of the legality of activities of a FIRE-PAC."

Asprooth testified that he had not decided whether it violated the rules for Evanston firefighters to identify themselves as members of the Evanston Firefighters Association.

We must take the case as it has been presented to us: The only prohibition before us is against individuals identifying themselves as City employees. City employees identifying themselves as members of any labor organization is not prohibited by the memorandum.

Some question has arisen over the applicability of the Municipal Code. The *amicus curiae*, Illinois State Federation of Labor and Congress of Industrial Organizations, which supports the Union's position, maintains that the Board erroneously failed to consider section 10—1—27.1 of the Municipal Code (Ill. Rev. Stat. 1989, ch. 24, par. 10—1—27.1), which provides as follows:

"No municipality covered under this Division 1 may make or enforce any rule or ordinance which will in any way inhibit or

prohibit any employee from exercising his full political rights to engage in political activities, including the right to petition, make speeches, campaign door to door, and to run for public office, so long as the employee does not use his official position to coerce or influence others and does not engage in these activities while he is at work on duty."

In its brief in this court, the City contended that the Union misinterpreted the Municipal Code. The City did not say that the Municipal Code was not applicable. It was the Board which maintained in its brief that the Municipal Code was not applicable because it had not been adopted by Evanston, a home rule unit. During oral argument in this court, both the City and the Union agreed that the Municipal Code is not binding on Evanston. The City maintains, however, that the ordinance in issue before us is the equivalent of section 10—1—27.1 of the Municipal Code. Asprooth testified that the ordinance "exists in place of" the Code. The Board takes the same position: "The language of the [Municipal] Code which prohibits an employee from using 'his official position *** to influence others' parallels the restrictions imposed by Evanston on its employees."

We judge that the issues before us are whether the City's ordinance violates section 6 of the Act, whether a City employee violates the ordinance's prohibition against "using" a position or a title simply by identifying that position or title and, if so, whether a prohibition against identifying a position or title is justified by the overriding interest of the City.

The language which the City maintains is the "crux of this case" is contained in section 6 of the Act:

"Employees of the State and any political subdivision of the State *** may form, join or assist any labor organization, to bargain collectively through representatives of their own choosing *** and to engage in other concerted activities not otherwise prohibited by law for the purposes of collective bargaining or other mutual aid or protection, free from interference, restraint or coercion." Ill. Rev. Stat. 1989, ch. 48, par. 1606(a).

It is the position of the City that its own ordinance is a "law" which prohibits City employees from identifying themselves as City employees. It is the position of the Union that the phrase "except as prohibited by law" does not include municipal ordinances, citing *City of Decatur v. Illinois State Labor Relations Board* (1986), 149 Ill. App. 3d 319, 500 N.E.2d 573, *rev'd on other grounds* (1988), 122 Ill. 2d 353, 522 N.E.2d 1219.

The Union presents an outwardly appealing argument. To illustrate, the Act permits certain public employees to strike (Ill. Rev. Stat. 1989, ch. 48, par. 1617), and secondary boycotts are permitted under the Act. Could a home rule unit bar all employees from striking and from engaging in secondary boycotts? Respectable arguments could be made that a municipality does not have the unfettered right to enact ordinances which would restrict the rights of public employees given to them under the Act, including the right to strike and to engage in secondary boycotts. In *City of Decatur v. Illinois State Labor Relations Board,* the supreme court said:

> "We do not believe that the legislature intended to make the broad duties imposed by the Act hostage to the myriad of State statutes and local ordinances pertaining to matters of public employment." 122 Ill. 2d at 364.

We note that the supreme court expressly refrained from passing on the holding of the appellate court that a municipal ordinance is not a law within the meaning of section 7 of the Act. (*City of Decatur,* 122 Ill. 2d at 364, citing Ill. Rev. Stat. 1985, ch. 48, par. 1607.) The supreme court observed that both parties to the case have "assumed that ordinances are in fact laws within that context." *City of Decatur,* 122 Ill. 2d at 367.

The Union has also cited *American Federation of State, County & Municipal Employees, Council 31 v. County of Cook* (1991), 145 Ill. 2d 475, 584 N.E.2d 116. Like *City of Decatur,* that case also was concerned with section 7 of the Act, which involves the duty of a municipality to bargain collectively. The Union argues that sections 6 and 7 should be construed consistently. First, we do not believe that *County of Cook* is a clear holding supporting the Union's argument. Certainly, the opinion does not address the question expressly. Moreover, we see distinctions between sections 6 and 7 of the Act. In any event, we have determined that we need not discuss the distinctions between sections 6 and 7 and that we need not decide whether the ordinance involved in this case is a "law" within the meaning of section 6, because we have determined that the memorandum in issue before us cannot be justified under the ordinance even if we assume that the ordinance constituted a law within the meaning of section 6.

■■ The City and the Board agree that the section of the City's Personnel Code in issue before us is for all practical purposes the same as section 10—1—27.1 of the Municipal Code and that the terms of the ordinance are to be construed the same as section 10—1—27.1. A still-remaining question to be resolved, therefore, is whether the mere identification of their occupations by City employees while en-

gaging in protected political activity constitutes the "use of [their] title or office to coerce or influence others."

None of the parties has cited any case which has passed on the question of whether a public employee, while engaging in protected political activity, uses his city title or office to coerce or influence another person simply by the act of identifying his employment, regardless of the circumstances. It is our judgment that such a broad interpretation of the ordinance is not warranted.

The Board stated that, although City employees had a legitimate interest in getting their message to the voters, they could have accomplished that goal without identifying themselves as City employees. The Board noted that the City's ordinance did not in any way limit the rights of employees to form FIRE-PAC or to participate in political activities as private individuals. The Board also acknowledged that City employees were free to campaign for particular candidates and to speak out on certain issues so long as they did not identify their connection to the City while doing so. Balancing the interests of the parties, the Board found that any interference with employee's rights which resulted from the City's ordinance was permissible. The remaining issue before us, therefore, is whether the City did establish an overriding interest in restricting the rights of City employees.

■ A brief discussion of the Hatch Act is appropriate because the City relies on it. The Hatch Act forbids a Federal employee from taking "formal positions in a political party," from "play[ing] substantial roles in partisan political campaigns, and [from] runn[ing] for office on partisan political tickets." *United States Civil Service Comm'n v. National Association of Letter Carriers, A F L-C I O* (1972), 413 U.S. 548, 565, 37 L. Ed. 2d 796, 809, 93 S. Ct. 2880, 2890.

We fail to see the applicability of the Hatch Act, because under the Evanston ordinance a City employee may hold a position in a political party, solicit funds for a political party or a candidate, make speeches for a political party or a candidate and may even run for office, including a party office. These are all activities barred by the Hatch Act.

The City has cited a number of cases upholding the right of a municipality to enact laws such as the Hatch Act. (*Wachsman v. City of Dallas* (5th Cir. 1983), 704 F.2d 160; *Salt Lake City Firefighters Local 1645 v. Salt Lake City* (1969), 22 Utah 2d 115, 449 P.2d 239; *Purdy v. Kreisberg* (1979), 47 N.Y.2d 354, 391 N.E.2d 1307, 418 N.Y.S.2d 329.) No one disputes the general principles enunciated in those cases. But Evanston has not passed such an ordinance. The only restriction imposed by the ordinance also contained in the Hatch Act

or the ordinances involved in the other cases cited by the City is a prohibition against an employee from using his official position or title to coerce or influence another person. The Union does not dispute that Evanston had the absolute right to enact an ordinance which would prevent employees from using their positions or titles to coerce or influence other persons. But the ordinance does not say that City employees may not even identify themselves as City employees when engaging in protected political activity. We are asked to accept the City's interpretation of the language. We repeat that the City's interpretation is unwarranted.

In *Letter Carriers*, the Supreme Court reaffirmed its holding in *United Public Workers of America (C.I.O.) v. Mitchell* (1947), 330 U.S. 754, 91 L. Ed. 754, 67 S. Ct. 556, in which the Supreme Court upheld the constitutionality of the Hatch Act. In *Letter Carriers*, the Supreme Court held that the first amendment rights of a public employee may be limited by the government's interest in maintaining an effective and impartial civil service system, and where the employees' rights and the government's interests conflict, a balancing test should be utilized. If the City's interpretation of the language of the ordinance is correct, we do not believe the City has demonstrated an overriding interest to support a blanket prohibition of City employees merely identifying themselves as such when participating in admittedly protected political activity. Some hypothetical cases will illustrate the unreasonableness of the City's position:

(1) The ordinance permits City employees to run for office; but they cannot tell the voters their occupations. Everyone but the candidates may utter or write the words identifying the candidates' positions or titles.

(2) A firefighter canvassing voters door-to-door urges the election of a candidate who supports the firefighter's views on "jump companies" and the closing of a particular station. That firefighter may not explain his source of expertise on the subject. (The attorney for the Board told us in oral argument that the firefighter could not identify his source of expertise, that is, he could not say he was a firefighter, *unless he was asked his occupation by the voter.*) Cf. *Pickering v. Board of Education of Township High School District 205* (1968), 391 U.S. 563, 20 L. Ed. 2d 811, 88 S. Ct. 1731 (first amendment rights of teachers upheld to express views on proper allotment of school funds because they were most likely to have informed and definite opinions on the question).

(3) A City employee attends a political rally and is introduced as a speaker by another person, who identifies the employee's position

with the City. There is no violation of the ordinance, so long as the City employee himself does not identify his City position.

(4) City employees may identify themselves as members of a municipal union, *e.g.*, FIRE-PAC or Federation of Police. But the same persons cannot identify themselves as municipal employees.

■ To summarize, we cannot accept the Board's conclusion that the mere fact that a City employee identifies his position represents a use of his title or position to coerce or influence another person for political purposes. Moreover, if we accept the interpretation of the ordinance advanced by the Board, the Board has not established an overriding interest in prohibiting employees from identifying themselves under any circumstances when that interest is considered in the light of all the other political activities granted to City employees. There is, in short, no logical justification for prohibiting City employees from merely identifying themselves as such. We agree with the Union that the memorandum represented an unreasonable abridgement of the Union members' first amendment rights and constituted an unfair labor practice.

We caution that our holding is a narrow one: a *blanket* proscription against all City employees identifying their positions, *regardless of the circumstances*, is not supported by the language of the City's ordinance and is not justified by any overriding interest of the City. We do not hold that employees' identification of their City positions under all circumstances may *never* be a violation of the ordinance that would subject the employees to disciplinary action.

For these reasons, the order of the Illinois State Labor Relations Board is reversed.

Order reversed.

McNAMARA,[2] P.J., and RAKOWSKI, J., concur.

---

[2]Justice Rosemary LaPorta participated in oral argument before her death. Justice Daniel J. McNamara was substituted on the panel. He has listened to the oral argument tape and has read the briefs.