170 P.3d 324

In the Matter of HAWAI'I GOVERN-MENT EMPLOYEES ASSOCIATION, AFSCME, LOCAL 152, AFL–CIO, Complainant–Appellant–Appellant

and

Amador Casupang, Labor Relations Specialist, Department of Transportation, State of Hawai'i; Lisa Dau, Department of Transportation, State of Hawai'i; Barry Fukunaga,[1] Director, Department of Transportation, State of Hawai'i; and Linda Lingle, Governor, State of Hawai'i (2004–006), Respondents–Appellees–Appellees,

and

Hawai'i Labor Relations Board, James B. Nicholson, Emory J. Springer, and Sarah R. Hirakami,[2] Agency–Appellees–Appellees.

No. 27800.

Supreme Court of Hawai'i.

Nov. 13, 2007.

---

1. Pursuant to Hawai'i Rules of Appellate Procedure (HRAP) Rule 43(c)(1), Barry Fukunaga (Fukunaga), the current Director of the Department of Transportation, has been substituted for Rodney Haraga, the Director at the time this case was decided by the first circuit court.

2. Pursuant to HRAP Rule 43(c)(1), James B. Nicholson, Chair of the Hawai'i Labor Relations Board (HLRB), and Sarah R. Hirakami, HLRB member, have been substituted for Brian K. Nakamura and Kathleen Racuya–Markrich, HLRB Chair and member, respectively, at the time this case was decided by the first circuit court.

Rebecca L. Covert (Herbert R. Takahashi on the opening brief and with her on the reply brief) (Takahashi Vasconcellos & Covert), Honolulu, for complainant-appellant-appellant.

David Fitzpatrick, Deputy Attorney General (James E. Halvorson Deputy Attorney General, with him on the brief) for respondents-appellees-appellees.

NAKAYAMA, ACOBA, and DUFFY, JJ.; WITH LEVINSON, J., concurring separately, and with whom MOON, C.J., joins.

Opinion of the Court by ACOBA, J.

This case is before us by virtue of our acceptance of a transfer from the Intermediate Court of Appeals (the ICA), Hawai'i Revised Statutes (HRS) § 602–58 (Supp.2006),[3]

**3.** HRS § 602–58 (Supp.2006) entitled "Application for transfer to the supreme court," states as follows:

(a) The supreme court, in the manner and within the time provided by the rules of court, shall grant an application to transfer any case within the jurisdiction of the intermediate appellate court to the supreme court upon the grounds that the case involves:

(1) A question of imperative or fundamental public importance;

(2) An appeal from a decision of any court or agency when appeals are allowed by law:

(A) Invalidating an amendment to the state constitution; or

(B) Determining a state statute, county ordinance, or agency rule to be invalid on the grounds that it was invalidly enacted or is ·

filed by Complainant–Appellant–Appellant the Hawai'i Government Employees Association, AFSCME, Local 152, AFL–CIO (HGEA or Appellant).

Appellant appeals from the February 21, 2006 judgment of the first circuit court (the court) [4] affirming the June 30, 2005 decision and order rendered by the HLRB dismissing a prohibited practice complaint (Complaint) filed by HGEA pursuant to HRS §§ 89–13 (Supp.2006) [5] and 89–14 (1993) [6] against Respondents–Appellees–Appellees,[7] employer and supervisors of affected HGEA members (Respondents or State) and Agency–Appellees–Appellees HLRB, Brian K. Nakamura, Emory J. Springer, and Kathleen Racuya–Markrich, then-members of the HLRB [collectively, HLRB or Board], for removal of election campaign materials from a State bulletin board assigned for "Union Notices."

We hold that the court's February 13, 2006 judgment affirming the June 30, 2005 decision and order rendered by the Board, dismissing HGEA's prohibited practice complaint is affirmed, because (1) there was no constitutional violation of the free speech

rights of public employees under the First and Fourteenth Amendments to the United States Constitution or article I, section 4 of the Hawai'i State Constitution, (2) the statutory rights of public employees to engage in "mutual aid or protection," HRS § 89–3 (Supp.2006), were not violated, (3) the Board did not exceed its jurisdiction by applying the State Ethics Code, HRS § 84–13, in this case, and (4) the Board did not misconstrue the preemption clause of HRS § 89–19 (Supp.2006).

## I.

The initial relevant facts garnered from the Board's "Findings of Fact" (findings) in its decision follow.

1. The HGEA is an employee organization, as defined in HRS § 89–2, [8] which represents all white-collar nonsupervisory State employees in bargaining unit (BU) 03. The Union was certified by the Board's predecessor, the Hawai'i Public Employment Relation board, as

---

unconstitutional, on its face or as applied, under either the constitution of the State or the United States; or

(3) A sentence of life imprisonment without the possibility of parole.

(b) The supreme court, in the manner and within the time provided by the rules of court, may grant an application to transfer any case within the jurisdiction of the intermediate appellate court to the supreme court upon the grounds that the case involves:

(1) A question of first impression or a novel legal question; or

(2) Issues upon which there is an inconsistency in the decisions of the intermediate appellate court or of the supreme court.

(c) The grant or denial of an application for transfer under subsection (b) shall be discretionary and shall not be subject to further review. Denial of an application for transfer under subsection (b) shall not prejudice a later application for a writ of certiorari.

4. The Honorable Sabrina S. McKenna presided.

5. This section identifies "prohibited practices" and is discussed *infra*.

6. HRS § 89–14 states:
 Any controversy concerning prohibited practices may be submitted to the board in the same manner and with the same effect as provided in section 377–9; provided that the

board *shall have exclusive original jurisdiction over such a controversy* except that nothing herein shall preclude (1) the institution of appropriate proceedings in circuit court pursuant to section 89–12(e) or (2) the judicial review of decisions or orders of the board in prohibited practice controversies in accordance with section 377–9 and chapter 91. All references in section 377–9 to "labor organization" shall include employee organization.
(Emphasis added.)

7. Respondents–Appellees–Appellees are Amador Casupang (Casupang), Labor Relations Specialist, Department of Transportation (DOT), State of Hawai'i; Lisa Dau (Dau), DOT, State of Hawai'i; Barry Fukunaga, Director, DOT, State of Hawai'i; and Linda Lingle (Lingle), Governor, State of Hawai'i.

8. HRS § 89–2 (Supp.2006) defines an "employee organization" as follows:

 [A]ny organization of any kind in which public employees participate and which exists for the primary purpose of dealing with public employers concerning grievances, labor disputes, wages, hours, amounts of contributions by the State and counties to the Hawaii employer-union health benefits trust fund or a voluntary employees' beneficiary association trust, and other terms and conditions of employment of public employees.

the exclusive representative of BU 03 on April 3, 1972.

2. *[Lingle] is the Governor of the State, and the public employer,* as defined in HRS § 89–2, of State employees in BU 03. [9]

3. *Casupang,* in his capacity as DOT's Labor Relations Specialist and Personnel Management Specialist IV, *Dau* in her capacity as DOT's Acting Business Manager, and [*Fukunaga*], in his capacity as DOT Director, *are designated representatives of the Governor and are deemed to be public employers within the meaning of HRS § 89–2.*

. . . .

5. Since on or about January 1, 1973, the HGEA and the State have been parties to successive collective bargaining agreements (Contract [or CBA]) covering BU 03 employees.

6. At all times relevant, the BU 03 Contract provided for Union Representation Rights covered in Article 7, and states in part as follows:

B. *The Union shall be provided adequate space on bulletin boards for posting of usual and customary Union notices.* Complainant's Exhibit (Ex.) 15–5, 17–4.

7. At all times relevant, the BU 03 Contract provided for Personnel Policy Changes in Article 4, which states in part as follows:

B. *No changes in wages, hours or other conditions of work contained herein may be made except by mutual consent.* Complainant's Ex. 15–4.

8. *At all times relevant, Arvid Youngquist* (Youngquist), a DOT State employee and member of HGEA's BU 03, *in his capacity as an HGEA shop steward, posted "usual and customary union notices" on DOT's bulletin board* located on the fourth floor of its office building consistent with Article 7B of the BU 03 contract. [10] To keep its membership informed and educated, the Union mails materials to its members, including Youngquist, in the form of general membership fliers and steward bulletins, or distributes information at steward meetings.

9. *The Union mailed its members cards and fliers of political endorsements and newsletters asking members to support Democrats on November 2, 2004.* Included in the mailings was an article entitled—"Talking Story with Mufi Hannemann" whom the HGEA endorsed for mayor in the HGEA Public Employee, July 2004, Vol. 39 issue; and a 2004 legislative score card that not only showed how U.S. House and Senate voted on issues important to HGEA, but also identified candidates that the HGEA opposed and supported. The Union's purpose for these mailings was "to educate [the] members on why it is important to support certain candidates or a certain party for their benefit, whether it be salary, retirement, or health benefits."

10. Sometime before October 14, 2004, *Youngquist posted on the DOT's fourth floor bulletin board the following materials: 1) an HGEA mailed card entitled: "Veto–Proof: Lingle Wins, You Lose" message, encouraging members to "Elect Democrats on November 2nd"; 2) HGEA Public Employee, July 2004 Vol. 39 Newsletter that includes a letter from*

---

9. HRS § 89–2 states that an "employer" or "public employer"

means the governor in the case of the State, the respective mayors in the case of the counties, the chief justice of the supreme court in the case of the judiciary, the board of education in the case of the department of education, the board of regents in the case of the University of Hawaii, the Hawaii health systems corporation board in the case of the Hawaii health systems corporation, and *any individual who represents one of these employers or acts in their interest in dealing with public*

employees. In the case of the judiciary, the administrative director of the courts shall be the employer in lieu of the chief justice for purposes which the chief justice determines would be prudent or necessary to avoid conflict.

(Emphasis added.)

10. Article 7B of the BU 03 contract states, "The Union shall be provided adequate space on bulletin boards for posting of usual and customary Union notes."

*HGEA Executive Director Russell Okata endorsing Mufi Hannemann and John Kerry, a "Why It's Important to Vote" article, and HGEA's early endorsements of candidates for Congress, State Senate and House of Representatives, Hawai'i County and City and County of Honolulu races; 3) Malama Pono, Volume XXXVII, No. 6, an official publication of the United Public Workers (UPW) AFSCME, Local 646, AFL-CIO, October 2004, issue that includes a Report of the State Director "Mufi Hanneman for Mayor"; and 4) 2004 Legislative score card of key votes by the Congressional Delegation on issues important to HGEA.* Youngquist obtained these materials from HGEA either through the mail or at the steward or union membership meetings.

11. *On or about October 14, 2004, Dau saw a picture of Mufi Hannemann and the words "vote for Mufi Hannemann" in a UPW newsletter posted on DOT's fourth floor bulletin board for Union notices.* Dau sought the advice of Casupang about the appropriateness of having campaign literature posted. Casupang advised Dau that based on the Hawai'i State Ethics Commission's campaign restrictions flier, the DOT is not allowed to have campaign literature on the bulletin board; and Casupang recommended that Dau meet with Youngquist about the materials he posted. Dau and Casupang met with Youngquist and his supervisor, Robert M. Unangst (Unangst) to discuss the materials posted. *Dau asked Youngquist to remove the campaign literature that included the Union's politi-*

cal endorsements on the bulletin board, because she believed the UPW's "vote for Mufi Hanneman" newsletter on DOT's bulletin board should not be posted based on her interpretation of the Hawai'i State Ethics Commissions flier covering campaign restrictions under [HRS] § 84–13. [11] Dau agreed to Youngquist's request to get an opinion from the Hawai'i State Ethics Commission about the campaign materials that Youngquist had posted. (CRA 360–363)

12. Dau and Casupang relied on a bulletin issued by the Hawai'i State Ethics Commission entitled "Campaign Restrictions for State Officials and State Employees [HRS chapter 84]" which reads in part as follows:

> **INTRODUCTION:** *The following restrictions on campaign activities are based on [HRS § ]84–13, entitled the "Fair Treatment" section of the State Ethics Code. In general, [HRS § ]84–13 prohibits the preferential use of state resources or incidents of state office.* Examples of campaign activities, described below, that violate or may violate the ethics code are for illustration only and are not meant to be all inclusive.
>
> **STATE OFFICIALS AND EMPLOYEES WHO MUST COMPLY WITH THE RESTRICTIONS:** All state officials, state employees, state legislators, and state board and commission members. State justices and judges are not subject to the jurisdiction of the State Ethics Commission, but are subject to the Commission on Judicial Conduct.
>
> **CAMPAIGN RESTRICTIONS**

---

11. HRS § 84–13 (1993) provides in pertinent part that:

> No legislator or *employee shall use or attempt to use* the legislator's or *employee's official position to secure or grant unwarranted privileges, exemptions, advantages,* contracts, *or treatment, for oneself or others; including but not limited to the following:*
> (1) Seeking other employment or contract for services for oneself by the use or attempted use of the legislator's or employee's office or position.
> (2) Accepting, receiving, or soliciting compensation or other consideration for the per-

formance of the legislator's or employee's official duties or responsibilities except as provided by law.
(3) Using state time, equipment or other facilities for private business purposes.
(4) Soliciting, selling, or otherwise engaging in a substantial financial transaction with a subordinate or a person or business whom the legislator or employee inspects or supervises in the legislator's or employee's official capacity.
(Emphases added.)

THE FOLLOWING ACTIVITIES BY STATE OFFICIALS AND STATE EMPLOYEES VIOLATE THE STATE ETHICS CODE:

**1. Using state time, equipment[,] supplies, or state premises for campaign activities or campaign purposes.**

\* \* \*

State premises *include state offices, conference rooms, working areas, and so forth.* State premises or facilities that are available to the public for use (e.g., for holding meetings or conducting business) may also be used for campaign activities on the same basis as the facilities are available to the public.

**Campaign activities or campaign purposes** include: (a) selling, purchasing, or distributing campaign fundraiser tickets, including complimentary tickets; (b) conducting campaign meetings; *(c) distributing campaign literature and materials;* (d) soliciting campaign assistance or support; or *(e) producing campaign literature or materials or storing such materials.*

. . . .

14. By letter dated October 18, 2004, Unangst forwarded the campaign materials to the Hawai'i State Ethics Commission, and asked for an opinion as to whether the "State is within our rights to pull such items off the board or should we put them back up!" [12]

15. *On and after October 29, 2004, Dau informed Youngquist that he was free to continue posting any and all HGEA* materials *on DOT's bulletin board that did not include campaign materials. Dau or Unangst did not review or approve Youngquist's subsequent postings of usual and customary union notices prior to posting.* And although there was some earlier discussions on or about October 24 with Youngquist about Dau or Unangst reviewing the postings, that did not occur.

(Emphases added.) (Boldfaced font in original.)

The bulletin board was described as "shared" and "one continuous bulletin board" in the court transcript. However, in the exhibits it appears that a separate partitioned portion of the bulletin board is designated for "Union Notices." It also appears that adjacent to the Union Notices portion of the bulletin board, is an employee section which includes such items as "minimum wage," health and safety, and "job" information.

Appellant's October 22, 2004 Complaint stated in relevant part as follows:

20. By the aforementioned and other acts and deeds (to be established at a hearing before this Board) [R]espondents [Casupang], Dau, [Fukunaga], and Lingle willfully engaged in:

a. Inherently destructive conduct which diminished and impaired the HGEA as the exclusive bargaining representative of [BU] 3 employees and penalized employees in [BU] 3 for their exercise of protected concerted activity in violation of [HRS §§ ]89–3 [ 13] and 89–13(a)(1) [14].

12. The letter stated:
Aloha! Here are the items that were posted on the fourth floor hallway employee bulletin board. Please advise and let me know if the State is within our rights to pull such items off the board or should we put them back up! Please expedite these matters within reason.
As discussed per our 10/15/04 telephone conversation, I do not wish to incur any regrettable situation for the State of Hawaii or our employees.

13. HRS § 89–3 (Supp.2006) defines the "Rights of employees" as follows:
Employees shall have the right of self-organization and the right to form, join, or assist any employee organization for the purpose of bargaining collectively through representatives of their own choosing on questions of wages, hours, and other terms and conditions of employment, including retiree health benefit contributions, *and to engage in lawful, concerted activities for the purpose of collective bargaining or other mutual aid or protection, free from interference, restraint, or coercion.* An employee shall have the right to refrain from any or all of such activities, except for having a payroll deduction equivalent to regular dues remitted to an exclusive representative as provided in section 89–4.
(Emphasis added.)

b. Unlawful discrimination in regard to terms or conditions of employment to discourage membership in an employee organization in violation of [HRS § ]89–13(a)(3).

Appellant requested that the Board adjudge Respondent in violation of HRS chapter 89 and order appropriate relief, excluding but not limited to: "[ (a) d]eclaratory relief in favor of [Appellant]; [ (b) a] cease and desist order prohibiting [R]espondent[ ] from engaging in the prohibited practices; [ (c) m]ake whole relief for adversely affected employees; and [ (d) o]ther 'affirmative' relief to ensure full compliance with [HRS] chapter 89 and the applicable provisions of the [CBAs]."

In their November 9, 2004 answer to the Complaint, Respondents argued, in pertinent part, that "Respondents complied with HRS [c]hapter 84, Standards of Conduct (Campaign Restrictions for State Officials and State Employees)."

On November 8, 2004, Jeffrey A. Keating (Keating), Deputy Attorney General, had a telephone conversation with Virginia M. Chock (Chock), Staff Attorney of the State Ethics Commission (the Ethics Commission). On November 9, Keating .sent a letter to Chock requesting a "written response as to whether the HGEA is permitted to post campaign materials on the office bulletin boards, or whether such conduct is in violation of HRS [c]hapter 84, Standards of Conduct."

On December 3, 2004, Keating sent Chock another letter again requesting the written response, and also that he receive it prior to December 11, 2004, the date prehearing statements were due for the Prehearing Conference and Hearing on the Complaint.

On December 8, 2004, Chock responded to Keating's letters. Her letter stated that the matter would be presented to the Commission:

This is in reply to your letters, dated November 9, 2004, and December 3, 2004, in which you requested a written response as to whether, under the State Ethics Code, [HRS chapter 84], the HGEA is permitted to post campaign materials on office bulletin boards.

This is a complex inquiry to which we cannot provide an immediate answer. I have been informed by Daniel J. Mollway, Executive Director and General Counsel of [the Ethics Commission (Mollway or Director) ], that, based on the nature of your quest, this matter will require extensive research, and further, that it will be necessary to present this matter to our Commission for determination. Mr. Mollway estimates that this process will take two to three months.

Mr. Mollway is currently out of town and will contact you when he returns. Thank you for your patience in this matter.

On December 21 and 23, 2004, the Board held hearings where "both parties were afforded [a] full opportunity to present evidence and argument before the Board." Respondents Dau and Casupang testified. Sanford Chun, an HGEA field officer, testified for Appellants, as did Unangst. At the hearing, Mollway testified as to the bulletin the Ethics Commission had developed pursuant to the Fair Treatment Section of the State Ethics Code, HRS § 84–13.

Thereafter, on January 3, 2005, Mollway sent Keating a letter which stated in part that "state officials and employees are barred by HRS section 84–13 of the State Ethics Code from placing political campaign materials on state office bulletin boards." Additionally, Mollway indicated the matter would not be submitted to the Ethics Commission:

Finally, in a letter from our office to you dated December 8, 2004, I indicated that this matter was complex and would need to

---

14. HRS § 89–13 (Supp.2006) enumerates "Prohibited Practices" and "evidence of bad faith" and provides:

(a) It shall be a prohibited practice for a public employer or its designated representative wilfully to:

(1) Interfere, restrain, or coerce any employee in the exercise of any right guaranteed under this chapter;

(3) Discriminate in regard to hiring, tenure, or any term or condition of employment to encourage or discourage membership in any employee organization;

. . . .

(7) Refuse or fail to comply with any provision of this chapter[.]

be taken to the State Ethics Commission for an opinion, which I indicated might take several months to issue. However, after considering this matter from the time of its inception in October, and in depth after December 8, it is my belief that the above opinion falls within prior Commission rulings regarding campaigning and the use of state resources, and thus I believe this letter can be issued at this time.

Mollway's written opinion was submitted as an exhibit by Respondents and referenced in the Board's decision.

Respondents filed a Motion to Re-open Record on January 24, 2005, and Appellant filed a Memorandum in Opposition to Respondents' Motion to Reopen Record on January 31, 2005. On February 2, 2005, the Board denied Respondents' motion, and on April 4, 2005, both parties filed post hearing briefs with the Board.

On June 30, 2005, the Board dismissed Appellant's Complaint. Relevant to its "Conclusions of Law" (conclusions) were the following findings:

13. *The Board majority found no evidence of Union animus when Dau asked Youngquist to remove the campaign materials from the Union's section of DOT's bulletin board.* Dau is a member of the same Union as Youngquist and she would have asked a nonunion member to remove campaign materials if posted on the DOT bulletin board. Furthermore, Dau did not order Youngquist to remove specific items. Youngquist selected the materials and gave them to his supervisor to send to the [Ethics Commission].

. . . .

16. *[Mollway] opined that a state employee, like Youngquist, cannot post campaign materials on state premises, like the DOT's bulletin board, based on his interpretation and application of the fair treatment section of the State Ethics Code, HRS § 84–13.* Under the Hawai'i State Ethics Code, a State official cannot give preferential treatment by allowing a non-state employee to post campaign materials on a state bulletin board.

*Mollway defined campaign materials as "material or conduct that advocates for one candidate over another, or material or conduct that otherwise advocates for the election of a candidate."*

17. Based on Mollway's interpretation of HRS § 84–13, and his review of the campaign materials received from the DOT, the union cannot post campaign materials on state office bulletin boards because to do so involves the use of state property, which is paid for by the taxpayers, and the state property would constitute a state resource that is controlled by a state official. Therefore, a state official violates the Hawai'i State Ethics Code when he or she allows state resources to be used for campaign purposes.

18. *The Board majority finds that Complainant failed to prove by a preponderance of the evidence that Youngquist's one time removal of HGEA's newsletters and notices that contained political endorsements of candidates and other campaign related materials, which are distributed to HGEA's members through the mail or at union meetings, interfered with the Union's ability to educate and communicate with its members, or changed any conditions of work to require good faith bargaining.*

(Emphases added.)

In the relevant conclusions, the Board declared the following:

2. [Appellant] failed to prove by a preponderance of evidence that Respondents unlawfully interfered with the rights of public employees to engage in protected concerted activity for "mutual aid or protection" within the meaning of HRS [ ]§ 89–3 . . . and committed a prohibited practice under HRS §§ 89–13(a)(1) and (7).

3. [Appellant] failed to prove by a preponderance of the evidence that Respondents engaged in unlawful discrimination to undermine the Union and deter protected conduct that was "inherently destructive of employee rights," and com-

mitted a prohibited practice under § 89–13(a)(3).

. . . .

6. *The Board majority concludes that the State Ethics Code, HRS § 84–13, is not a "conflicting statute on the same subject matter" within the meaning of HRS § 89–19.* [15] The State Ethics Code relates to the posting of "usual and customary union notices," which is an existing condition of employment negotiated in Article 7B. As State employees[,] Respondents, as well as Youngquist, are duty bound to comply with the campaign restrictions set forth in the State Ethics Code as it applies to the posting on State premises of Union notices that contain campaign materials. And, the Respondents cannot be required to negotiate the conditions set forth in Article 7B that would allow them to act contrary to their statutory duty under the State Ethics Code.

(Emphasis added.)

Chairman Brian K. Nakamura dissented from the Board decision and opined:

By its decision the majority condones the rights of management to censor on the basis of content union-member communications on a matter of utmost importance in a forum contractually dedicated to such communication.

HRS § 89–3 protects the rights of a union and its membership to engage in "concerted activity for mutual aid [or] protection." The Supreme Court has held that this right encompasses the workplace distribution of a union newsletter urging members to register to vote and to "vote to defeat our enemies and elect our friends." [*Eastex, Inc. v. NLRB,* 437 U.S. 556, 98 S.Ct. 2505, 57 L.Ed.2d 428 (1978) ]. *Eastex* involved union communications with private employees regarding the somewhat attenuated political issue of minimum wage legislation. The communi-

cations at issue here were to public employees regarding union endorsements. Elected officials negotiate, fund and administer public workers [CBAs]. They have [the] power to influence virtually every condition of employment. To hold that communications identifying the workers' friends and enemies robs the right of meaning [sic]. The majority ignores the substance and relevance of the communications by concluding that the employees rights were not infringed upon because the newsletters were probably mailed to all union members. By this reasoning, any right of workplace communication may be subverted to proof of an adequate mailing list or rolodex thereby rendering the right a virtual nullity.

The majority also undermines the precedence of collective bargaining rights as mandated in HRS § 89–19 and it misconstrues the Hawai'i Supreme Court decision in [*State of Hawai'i Org. of Police Officers (SHOPO) v. Soc'y of Prof'l Jounalists–Univ. of Hawai'i Chapter,* 83 Hawai'i 378, 927 P.2d 386 (1996) (hereinafter *SHOPO,*) ] to do so. In that decision the [c]ourt held that HRS § 89–19 extends only to statutory provisions of [HRS c]hapter 89 and not to the specific provisions of the [CBAs] derive[d] therefrom. The [c]ourt therefore found the provisions of [HRS c]hapter 92 not to be preempted by a conflicting provision in the *SHOPO* [CBA]. In the instant case the provisions of the Ethics code as interpreted by Mr. Mollway stand in direct conflict not only with a provision of the CBA but with an express statutory right of membership to engage in "concerted activity for mutual aid [or] protection." If by its opinion, the Board is requiring expressly conflicting language, then it is draining HRS § 89–19 of its meaning.

For a public worker union, the ability to communicate with its membership regarding electoral activities goes to the heart o[f] the right to engage in "concerted activ-

15. HRS § 89–19 dictates that Chapter 89, "Collective Bargaining in Public Employment[,]"
 *shall take precedence over all conflicting statutes concerning this subject matter and shall preempt all contrary local ordinances, executive orders, legislation, or rules adopted by the*

State, a county, or any department *or agency thereof,* including the departments of human resources development or of personnel services or the civil service commission.
(Emphases added.)

ity for mutual aid [or] protection." Like all citizens, public workers have a right to "vote to defeat our enemies and elect our friends." The identification of friends and enemies is central to "mutual aid [or] protection" and such communications are protected by [HRS c]hapter 89. However well-intentioned, unilateral management limitations on such communications violate Chapter 89. And however clumsily clever, the condoning of such a violation is wrong.

On July 29, 2005, Appellant appealed the Board's decision to the court. Appellant raised the same issues that it raised in its opening brief to this court. Likewise, the State responses before the court were substantially the same as the ones contained in its answering brief to this court.[16] *See infra*

After oral arguments on January 23, 2006, the court affirmed the decision of the Board and stated that "the [c]ourt agrees with the Board for reasons stated in that opinion.... The decision of the Board is affirmed." Thus, the court entered the February 13, 2006 order affirming the Board's decision and the February 21, 2006 judgment in favor of Respondents and the Board and against Appellant.

## II.

On appeal Appellant contends that the court's judgment affirming the decision and order rendered by the Board

(1) violates the constitutional right of free speech of public employees under the First and Fourteenth Amendment[s] of the United States Constitution and [a]rticle I, [s]ection 4 of the Hawai'i State Constitution[;] (2) infringes the statutory rights of

employees to engage in "mutual aid [or] protection" under [HRS § 89–3] as construed and applied in [*Eastex;*] (3) exceeds [the] statutory jurisdiction of HLRB which has no authority to interpret or apply the State Ethics Code[, HRS § 84–13;] and (4) misconstrues the preemption clause of Section 89–19, HRS. [17]

Appellant requests that the court's order and judgment entered on February 13, 2006, and the Board's decision and order dated June 30, 2005, be reversed.

## III.

As to agency appeals, this court has said:

" 'Review of a decision made by a court upon its review of an administrative decision is a secondary appeal. The standard of review is one in which this court must determine whether the court under review was right or wrong in its decision.' " *Soderlund v. Admin. Dir. of the Courts*, 96 Hawai'i 114, 118, 26 P.3d 1214, 1218 (2001) (quoting *Farmer v. Admin. Dir. of the Court*, 94 Hawai'i 232, 236, 11 P.3d 457, 461 (2000)) (brackets omitted). It is well settled that " '[i]n an appeal from a circuit court's review of an administrative decision, the appellate court will utilize identical standards applied by the circuit court.' " *Price v. Zoning Bd. of Appeals*, 77 Hawai'i 168, 171, 883 P.2d 629, 632 (1994) (quoting *Mauna Kea Power Co. v. Bd. of Land & Natural Res.*, 76 Hawai'i 259, 264, 874 P.2d 1084, 1089 (1994)).

When a court reviews the decision of an administrative agency, HRS § 91–14(g) (1993) governs. "[A]ppeals taken from findings set forth in decisions of the [agen-

(Emphasis added.)

---

**16.** Although it does not appear that the First Amendment issue, *see infra*, was raised before the Board, Respondents do not argue that it cannot be argued before this court. It appears that the court and this court may consider the issue based on HRS § 91–14(g)(1) (Supp.2006), which states that the reviewing court may

affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioner may have been prejudiced because the administrative findings, conclusions, decisions or orders are ... in violation of *constitutional* or statutory provisions.

**17.** The State responds that (1) "HGEA's First Amendment challenge to Federal and State restriction on the posting of campaign materials was rejected by *Burrus v. Vegliante*, 336 F.3d 82 (2d Cir.2003)"; (2) the *Eastex* decision is inapposite because "the Board found the union is free to distribute campaign materials to its members and has mailed them to its members without interference"; (3) "the union's suggestion that the Board exceeded its authority is without merit, and there is no willful violation of HRS Chapter 89"; and (4) "the union misconstrues the preemption provisions of HRS Section 89–19."

84

cy] are reviewed under the clearly erroneous standard. Thus, [the] court considers whether such a finding is clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record." *Bocalbos v. Kapiolani Med. Ctr. for Women & Children,* 93 Hawai'i 116, 124, 997 P.2d 42, 50 (App.2000) (citations, internal quotation marks, brackets, ellipses, and emphasis omitted).

On the other hand, "conclusions of law ... are freely reviewable to determine if the agency's decision was in violation of constitutional or statutory provisions, in excess of statutory authority or jurisdiction of agency, or affected by other error of law." *Poe v. Hawai'i Labor Rels. Bd.,* 87 Hawai'i 191, 195, 953 P.2d 569, 573 (1998). "Hence, an agency's statutory interpretation is reviewed *de novo." Keanini v. Akiba,* 93 Hawai'i 75, 79, 996 P.2d 280, 284 (App.2000).

*Hoopai v. Civil Serv. Comm'n,* 106 Hawai'i 205, 214, 103 P.3d 365, 374 (2004) (footnote omitted).

■ On questions of constitutional law, "[t]his court reviews questions of constitutional law *de novo,* under the 'right/wrong' standard and, thus, exercises its own independent constitutional judgment based on the facts of the case." *State ex rel. Anzai v. City & County of Honolulu,* 99 Hawai'i 508, 515, 57 P.3d 433, 440 (2002) (citing *State v. Jenkins,* 93 Hawai'i 87, 100, 997 P.2d 13, 26 (2000) (citations omitted)). " 'Whether speech is protected by the first amendment to the United States Constitution, as applied to the states through the due process clause of the fourteenth amendment, is a question of law which is freely reviewable on appeal.' " *In re Doe,* 76 Hawai'i 85, 93, 869 P.2d 1304, 1312 (1994) (citations and brackets omitted). In interpreting and applying article I, section 4 of the Hawai'i Constitution, this court considers the case law established under the first amendment to the United States Constitution. *See, e.g., Janra Enters., Inc. v. City & County of Honolulu,* 107 Hawai'i 314, 323, 113 P.3d 190, 199 (2005).

As to HRS chapter 89, Appellant points out that, "[i]n its interpretations of chapter 89, the Hawai'i Supreme Court has found

U.S. Supreme Court, federal appellate court ... and labor board precedent governing private and public sector labor relations 'instructive.' " (Citing *Haw. State Teachers Ass'n v. Haw. Pub. Employment Relations Bd.,* 60 Haw. 361, 365, 590 P.2d 993, 996 (1979); *Univ. of Haw. Prof'l Assembly v. Tomasu,* 79 Hawai'i 154, 159, 900 P.2d 161, 166 (1995).).

IV.

In regard to issue (1), Appellant contends that "[a] State agency which creates a 'designated public forum' or a 'limited public forum' may not enforce a ban based on the content or viewpoint of its user without violating the First Amendment." (Citations omitted.)

A.

■ Initially, in order to make a claim under the First Amendment, Appellant must show that there has been a state action that implicates speech because the state "must respect the commands of the First Amendment" and "[i]t is decades of settled jurisprudence that require judicial review of state action that is challenged on First Amendment grounds." *Ark. Educ. Television Comm'n v. Forbes,* 523 U.S. 666, 693 n. 17, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998) (Stevens, J., dissenting) (citations omitted). Appellant asserts that "the ban was imposed by public officials acting on behalf of Lingle, an 'employer' as defined in [HRS § 89–2 which] constitutes a 'state action,' *Abood v. Detroit Bd. of Educ.,* 431 U.S. 209, 226[, 97 S.Ct. 1782, 52 L.Ed.2d 261] (1977), [and that] implicates 'constitutional interests' under the First Amendment, *Perry Ed. Ass'n [v. Perry Local Educators' Ass'n],* 460 U.S. [37,] 44[, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) ]." According to Appellant, "since the ban proscribed HGEA publications containing" campaign materials urging union members to support candidates who were sympathetic to union views, "it undoubtedly involved 'speech' on questions over which 'free and open debate is vital to informed decision making by the electorate,' *Pickering v. Bd. of Educ.,* 391 U.S. 563, [571–]72[, 88 S.Ct. 1731,

20 L.Ed.2d 811] (1968)." Finally, Appellant urges that there was state action, in that Dao, Casupang, and Unangst, designated as State employers, required the HGEA steward to remove all HGEA postings concerning "political endorsement" and to stop future posting pending word from the Ethics Commission.

There is no question that there was state action here and Respondents do not dispute this. There is also "no question that constitutional interests are implicated" here, as Appellant contends. As Appellant urges, "[i]t has long been recognized that the First Amendment has 'its fullest and most urgent application' to speech uttered during political campaigns. *Buckley v. Valeo*, 424 U.S. 1, 14–15[, 96 S.Ct. 612, 46 L.Ed.2d 659] (1976); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346–47[, 115 S.Ct. 1511, 131 L.Ed.2d 426] (1995)." Manifestly, advocating for the election of a particular candidates is "speech" and, thus, implicates the First Amendment.

### B.

Regarding public fora, the Court in *Perry* first indicated that in traditional public fora, content-based exclusions are subject to a compelling state interest limitation.

In places *which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the state to limit expressive activity are sharply circumscribed. At one end of the spectrum are streets and parks which "have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions."* Hague v. CIO, 307 U.S. 496, 515[, 59 S.Ct. 954, 83 L.Ed. 1423] (1939). In these quintessential public forums, the government may not prohibit all communicative activity. *For the state to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.* Carey v. Brown, 447 U.S. 455, 461[, 100 S.Ct. 2286, 65 L.Ed.2d 263] (1980).

460 U.S. at 45, 103 S.Ct. 948 (emphases added).

Next, the *Perry* Court explained that in the second category of public property known as limited or designated public fora, reasonable time, place, and manner regulations were allowed and content-based exclusions were subject to a compelling state interest standard.

A second category *consists of public property which the state has opened for use by the public as a place for expressive activity. The Constitution forbids a state to enforce certain exclusions from a forum generally open to the public even if it was not required to create the forum in the first place. Widmar v. Vincent,* 454 U.S. 263[, 102 S.Ct. 269, 70 L.Ed.2d 440] (1981) (university meeting facilities); *City of Madison Joint School Dist. v. Wis. Pub. Employment Relations Comm'n,* 429 U.S. 167[, 97 S.Ct. 421, 50 L.Ed.2d 376] (1976) (school board meeting); *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546[, 95 S.Ct. 1239, 43 L.Ed.2d 448] (1975) (municipal theater). *Although a state is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum.* Reasonable time, place and manner regulations are permissible, and a content-based prohibition must be narrowly drawn to effectuate a compelling state interest. *Widmar v. Vincent, supra,* 454 U.S. at 269–270[, 102 S.Ct. 269].

*Id.* at 45–46, 103 S.Ct. 948 (emphases added).

The Court further noted that "[a] public forum may be created for a limited purpose such as use by certain groups," *id.* at 46 n. 7, 103 S.Ct. 948 (citing, *e.g., Widmar, supra* (student groups)) or it could also be created "for the discussion of certain subjects," *id.* (citing, *e.g., City of Madison Joint School Dist., supra* (school board business)).

Finally, the Court recognized a third category of government property, a non-public forum, where the government is entitled to "reserve the forum for its intended purposes" subject to reasonable regulation.

Public property which is not by tradition or designation a forum for public communication is governed by different standards. We *have recognized that the "First Amendment does not guarantee access to property simply because it is owned or controlled by the government."* U.S. Postal Serv. v. Greenburgh Civic Ass'n, 453 U.S. [114,] 129[, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981)]. In addition to time, place, and manner regulations, *the state may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.* Id. at 131 n. 7[, 101 S.Ct. 2676]. As we have stated on several occasions, "the State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Id.* [at] 129[, 101 S.Ct. 2676]; *Greer v. Spock,* 424 U.S. 828, 836[, 96 S.Ct. 1211, 47 L.Ed.2d 505] (1976); *Adderley v. Florida,* 385 U.S. 39, 48[, 87 S.Ct. 242, 17 L.Ed.2d 149] (1966).

*Perry,* 460 U.S. at 46, 103 S.Ct. 948 (emphases added).

## V.

### A.

 Appellant appears to argue that the union bulletin board in this case constituted either a traditional public forum or a designated or limited public forum. However, the bulletin board did not constitute a traditional public forum. There was no evidence indicating that union bulletin boards are "places which by long tradition or public fiat have been devoted to assembly and debate." *Id.* at 45, 103 S.Ct. 948. The union bulletin board is not markedly similar to the "streets or parks which have immemorially been held in trust for the use of the public[.]" *Id.* (internal quotation marks and citations omitted). Thus, union bulletin boards would not fall into the category of public fora.

As to the contention that the union bulletin board constitutes a designated public forum, Appellant maintains that the "union bulletin boards are authorized as a forum for expressive activity for public employees and their representatives by statute in [HRS § 89–3], by contract in Section 7B, and by undisputed past practice and custom of the parties." Specifically, Appellant asserts that "[t]he agreement refers to the union bulletin board as a 'union representation right,' and it mandates that 'adequate space' be provided for 'posting of usual and customary union notices[,]'" "[t]here is unrebutted testimony in this case that HGEA has historically used the union bulletin boards to endorse candidates for public office and to publish their views on concerns impacting on public employee wages, benefits, and working conditions for decades[,]" and thus, "the union bulletin boards are designated forum or limited public forum[.]"

Even assuming, *arguendo,* Appellant's arguments are all true, Appellant sets forth no argument indicating how a union bulletin board, open only for that union's use, constitutes a designated public forum. Although Appellant points to the contract provision allowing the HGEA use of the board and to the historical practice of HGEA's use of the board, it does not identify in the record an indication that the board has been designated as a public forum and, although "[a] public forum may be created for a limited purpose such as use by certain groups," *id.* at 46 n. 7, 103 S.Ct. 948 (citation omitted), Appellant does not cite to any case law in which a designated public forum was created for use by one group.

### B.

The facts of *Perry* are instructive. *Perry* involved a mailing system which permitted messages to be delivered rapidly to teachers throughout a public school district consisting of thirteen separate schools. *Id.* at 39, 103 S.Ct. 948. The primary function of the system was to transmit official messages among teachers and between teachers and the administration. *Id.* However, the teachers also used the system to send personal messages and individual principals occasionally allowed various private organizations to use the mail system. *Id.*

Prior to 1977, two unions had represented teachers in the district and both unions were given equal access to the interschool mail system. *Id.* However, after an election, one union became certified as the "exclusive representative" as provided for by Indiana law. *Id.* at 40, 103 S.Ct. 948 (citing Ind.Code Ann. § 20–7.5–1–2(1)). The exclusive representative union negotiated a labor contract which gave it "access to teachers' mailboxes in which to insert material" and stipulated that access rights would not be granted to any other "school employee association." *Id.*

The second union, that had formerly represented some of the teachers, challenged its exclusion from the system. It argued that the school mail system had become a limited public forum through the periodic use of the system by private non-school connected groups and the union's own prior access. *Id.* at 47, 103 S.Ct. 948. Despite these arguments, the Court concluded that "[t]he school mail facilities at issue" fell within the third category of property defined above as nonpublic fora. *Id.* at 46, 103 S.Ct. 948. It explained that the mail system was not open for use by the general public and thus was not a public forum.

> The use of the internal school mail by groups not affiliated with the schools is no doubt a relevant consideration. If by policy or by practice the Perry School District has opened its mail system for indiscriminate use by the general public, then [the union] could justifiably argue a public forum has been created. This, however, is not the case. *As the case comes before us, there is no indication in the record that the school mailboxes and interschool delivery system are open for use by the general public.* ... We can only conclude that the schools do allow some outside organizations such as the YMCA, Cub Scouts, and other civic and church organizations to use the facilities. *This type of selective access does not transform government property into a public forum.*

*Id.* at 47, 103 S.Ct. 948 (emphases added).

### C.

Appellant concedes the instant case involves a "union bulletin board[ ]" located on a work site at the DOT. There is no evidence that the bulletin board at issue had been opened up for public use in any way. As in *Perry,* the property at issue is "public property which is not by tradition or designation a forum for public communication[.]" *Id.* Also similar to *Perry,* there is no suggestion in the record that the bulletin board at issue was "open for use by the general public." *Id.* at 47, 103 S.Ct. 948. In fact, it appears that the portion of the employee bulletin board, labeled "Union Notices" was only used by HGEA and was not open to use by any other groups. As the Supreme Court has noted, "[t]his type of selective access does not transform government property into a public forum." *Id.* Although Appellant insists that "the State created a limited or designated 'public forum' for union postings on *workplace* bulletin boards throughout the process of collective bargaining over a period of more than 30 years[,]" (emphasis added) for the reasons noted above, there is no evidence the nonpublic forum was transformed into a limited or dedicated public forum.

### VI.

Appellant relies on *Giebel v. Sylvester,* 244 F.3d 1182 (9th Cir.2001), and *Searcey v. Crim,* 681 F.Supp. 821 (N.D.Ga.1988), two cases where the respective courts determined that certain bulletin boards were designated public fora. Both cases are distinguishable from the present case. First, in *Giebel,* a professor had removed handbills from university bulletin boards publicizing a former colleague's speech at an upcoming university conference. 244 F.3d at 1185. *Giebel* stated that there was "uncontradicted evidence that the university's bulletin boards [were] available *for use by the public,* including persons not affiliated with the university, 'to communicate with students and others at the university' " and "evidence show[ed] that the university ha[d] no policy or practice of regulating content of the materials placed on the university bulletin boards." *Id.* at 1188 (emphasis added). Thus, that court concluded "the university's bulletin boards [were] designated public [fora]." *Id.*

Similarly in *Searcey*, a school board had created a policy allowing outside groups to present information on designated school bulletin boards to assist students in making career choices. 681 F.Supp. at 828. The Atlanta Peace Alliance, "a coalition of individuals and groups organized for the purpose of providing high school students in Atlanta with information on careers and educational opportunities related to peace as well as information to help them make informed choices concerning military enlistment[,]" *id.* at 823, brought suit challenging the school officials' denial of their request to present information about peacemaking and military service on the bulletin boards. *Id.* at 822–23. The federal district court noted that the school bulletin boards had been "*generally held open* to those who disseminate specific information regarding job and post-high educational opportunities." *Id.* at 828 (emphasis added) (internal quotation marks and citation omitted). Thus, *Searcey* concluded that the "bulletin boards constitute[d] public [fora] for the limited purpose of presenting information regarding post-secondary pursuits[,]" *id.*, and held that the school board could not restrict the peace activists from placing "educational and career oriented" literature on school bulletin boards, absent a compelling interest which it had not shown. *Id.* at 831.

Plainly, both cases are distinguishable because the bulletin boards involved had been held open to the public for a designated use. *See Giebel*, 244 F.3d at 1188 (explaining that there was "uncontradicted evidence that the university's bulletin boards [were] available *for use by the public*, including persons not affiliated with the university, 'to communicate with students and others at the University'" (emphasis added)); *Searcey*, 681 F.Supp. at 828 (concluding that the bulletin board was "generally held open" for job and post-high school education opportunities).

As noted above, Appellant plainly has not presented any evidence that the union bulletin board was available for any sort of public use.

## VII.

In response to HGEA's first amendment claims, Respondents rely on *Burrus*. As the State maintains, "the factual background in the *Burrus* case is strikingly similar to [the] facts in the present appeal." In *Burrus*, the American Postal Workers Union (APWU) brought suit after it was prohibited from displaying political materials on APWU bulletin boards. 336 F.3d at 84. An agreement between the APWU and the United States Postal Service provided that "[t]he Employer shall furnish separate bulletin boards for the exclusive use of the Union party to this Agreement, subject to the conditions stated herein, if space is available" and "[o]nly suitable notices and literature may be posted[.]" *Id.* According to the APWU, it had "regularly used these bulletin boards to make political endorsements by separate postings or through a 'News Service' that it regularly post[ed] on the bulletin boards." *Id.*

During the 2000 presidential election between George W. Bush and Albert H. Gore, the APWU distributed a poster comparing the campaign positions and voting records of both candidates. *Id.* As *Burrus* noted, "[w]hile the poster purported to present only factual information, the APWU does not seriously dispute that it was intended to generate support for Vice President Gore." *Id.* After the posters were displayed, the United States Office of Special Counsel issued an advisory opinion stating that the posting violated the Hatch Act.[18] *Id.* The *Burrus* court agreed and concluded that the publication fell under prohibited conduct in the Hatch Act. *Id.* at 90 (citing 5 U.S.C. § 7324(a) (generally

---

18. The Advisory Opinion referred to in *Burrus* stated:

 The Hatch Act (5 [United States Code (U.S.C.)] §§ 7321–7326) generally permits most federal employees, including United States Postal Employees to actively participate in partisan political management and partisan political campaigns. Covered employees, however, are prohibited from engaging in political activity while on duty, in a government office or building, while wearing an official uniform

or using a government vehicle. *See* 5 U.S.C. § 7324.

 Political activity has been defined as activity directed toward the success or failure of a political party, candidate for a partisan political office or partisan political group. 5 [Code of Federal Regulations (C.F.R.)] § 734.101. Therefore, covered employees are prohibited, among other things, from displaying or posting partisan political posters or partisan candidates' position statements in government of-

prohibiting federal employees from engaging in political activity while on duty or on government premises)).

Significantly, *Burrus* also rejected APWU's first amendment claims because "interior work areas of post offices are nonpublic fora" and "these work areas and bulletin boards are only open to the union, and then only with respect to 'suitable notices and literature,' which by any definition surely excludes material posted in violation of federal law." *Id.* at 90–91 (citations omitted). Similarly, in the instant case, the union contract provides that "adequate space" be provided for "posting of usual and customary union notices." There is no mention that the "interior work area[ ]" of the Department of Transportation has been transformed from a "nonpublic for[um]" into a public forum.[19] *Id.* at 91. Thus, it appears that the union bulletin board remains a non-public forum.

## VIII.

### A.

Having concluded that the union bulletin board constitutes a non-public forum, the remaining question is what speech the government can lawfully prohibit within a non-public forum. Relying on *Rosenberger v. Rector & Visitors of the Univ. of Virginia*, 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995), Appellant asserts that the ban was unlawfully content-based and constituted viewpoint discrimination. *Rosenberger* involved a student organization that published a newspaper espousing a Christian editorial viewpoint. *Id.* at 825–26, 115 S.Ct. 2510. The organization was denied monies from a university fund created to cover costs of student publications. *Id.* at 822–23, 115 S.Ct. 2510. In the portion of the case quoted by Appellant, *Rosenberger* explained that the government must refrain from regulating speech where it is specifically motivated by the "opinion or perspective of the speaker[.]"

It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys. *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 96[, 92 S.Ct. 2286, 33 L.Ed.2d 212] (1972). Other principles follow from this

---

fices or buildings, including union space and bulletin boards.
336 F.3d at 84 n. 3 (quoting Letter of 10/26/00 from William E. Reukauf, Associate Special Counsel for Prosecution, to Court Wheeler, Attorney, USPS).

19. Respondents argue that "[t]he prohibitions set forth in the Hatch Act are analogous to HRS § 84–13." As noted previously, HRS § 84–13 states that "[n]o legislator or employee shall use or attempt to use the legislator's or employee's official position to secure or grant unwarranted privileges, exemptions, advantages, contracts, or treatment, for oneself or others[.]" HRS § 84–13 provides examples of the above, none of which mentions politics, political activity, or any other similar term.

Appellant asserts in its reply brief that "*Burrus* involved federal employees [who] are governed by the Hatch Act which expressly prohibits 'political activity' on the job and at the work place," whereas, "there is no Hatch Act in Hawaii" and neither "the HGEA or the state and county employees it represents" are federal employees. Further, Appellant declares that "[i]n the proceedings before the [Board] the State did not raise as a 'defense' to the prohibited practice complaint by HGEA the Hatch Act."; *Burrus* is distinguishable because "undisputed evidence" in the present case establishes that the State created a "limited or designated 'public forum'";

"*Burrus* did not involve selective removal of postings based on the viewpoint expressed by a union over an issue of public importance to state employees"; and *Burrus* is distinguishable because the statute involved here, HRS § 84–13, is not "comparable in any way" to the Hatch Act.

Appellant attempts to distinguish the State Ethics Code by arguing that it relates "solely to the conduct of a 'legislator' or 'employee,' and imposes no restrictions on union endorsements." However, like the Hatch Act which prohibits federal employees from engaging in political activities, HRS § 84–13 has been interpreted to prohibit state employees from engaging in political or campaign activities on state premises. *See* Finding 12, *supra* at 79, 170 P.3d at 330 (stating that "[u]sing state time, equipment[,] supplies, or state premises for campaign activities or campaign purposes" is prohibited).

However, even if the Hatch Act is not applicable to state employees, *Burrus* is relevant. As noted above, the factual circumstances are markedly similar to the situation here, as *Burrus* also involved a union desiring to post campaign materials on union bulletin boards. 336 F.3d at 84. Further, *Burrus* addressed the issue of whether such a prohibition violated the first amendment and did a forum analysis. *Id.* at 91. Thus, *Burrus* supports a determination that the prohibition against campaign materials would not constitute a first amendment violation in the case where the bulletin board was a non-public forum and the restriction was "reasonable." *Id.*

precept. In the realm of private speech or expression, government regulation may not favor one speaker over another. *Members of City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 804[, 104 S.Ct. 2118, 80 L.Ed.2d 772] (1984). Discrimination against speech because of its message is presumed to be unconstitutional. *See Turner Broad. Sys., Inc. v. FCC,* 512 U.S. 622, 641–643[, 114 S.Ct. 2445, 129 L.Ed.2d 497] (1994). These rules informed our determination that the government offends the First Amendment when it imposes financial burdens on certain speakers based on the content of their expression. *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.,* 502 U.S. 105, 115[, 112 S.Ct. 501, 116 L.Ed.2d 476] (1991). *When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. See R.A.V. v. St. Paul,* 505 U.S. 377, 391[, 112 S.Ct. 2538, 120 L.Ed.2d 305] (1992). Viewpoint discrimination is thus an egregious form of content discrimination. *The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction. See [Perry* ], 460 U.S. [at] 46[, 103 S.Ct. 948].

*Id.* at 828–29, 115 S.Ct. 2510 (emphases added).

Applying the above principles, the Court concluded that the university had created a limited public forum and by not providing funds to the Christian newspaper, the university was committing viewpoint discrimination in violation of the first amendment. *Id.* at 837, 115 S.Ct. 2510. Although the principles outlined in *Rosenberger* regarding viewpoint discrimination are applicable to the instant case, *Rosenberger* is distinguishable from the present case in that the University of Virginia had created a limited public forum, whereas in this case, as noted above, only a non-public forum exists.

■ More pertinent here is *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,* 473

U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). In *Cornelius,* the Court reiterated that government may regulate a non-public forum *"as long as the restrictions are 'reasonable and are not an effort to suppress expression merely because public officials oppose the speaker's view.'" Id.* at 800, 105 S.Ct. 3439 (quoting *Perry,* 460 U.S. at 46, 103 S.Ct. 948) (emphasis added) (brackets omitted); *see also Berry v. Dep't of Soc. Servs.,* 447 F.3d 642, 654 (9th Cir.2006) (holding that a conference room was a non-public forum and that precluding an employee from holding bible study in the room did not violate employee's free speech rights because it was "reasonable[,]" and "that is all that is required for a nonpublic forum" (citing *Cornelius,* 473 U.S. at 808, 105 S.Ct. 3439)). *Cornelius* reemphasized that "a speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the purpose of the forum, *see Lehman v. City of Shaker Heights,* 418 U.S. 298[, 94 S.Ct. 2714, 41 L.Ed.2d 770] (1974), or if he is not a member of the class of speakers for whose especial benefit the forum was created, *see* [*Perry, supra* ]." 473 U.S. at 806, 105 S.Ct. 3439. Additionally, "[t]he [g]overnment's decision to restrict access to a nonpublic forum need only be reasonable; it need not be the most reasonable or the only reasonable limitation." *Id.* at 808, 105 S.Ct. 3439. Also, the "reasonableness of the [g]overnment's restriction of access to a nonpublic forum must be assessed in the light of the purpose of the forum and all the surrounding circumstances." *Id.* at 809, 105 S.Ct. 3439 (determining that it was reasonable for the President to conclude "that a dollar directly spent on providing food or shelter to the needy is more beneficial than a dollar spent on litigation that might or might not result in aid to the needy").

B.

Apparently, because Appellant is convinced that the bulletin boards constitute, at the very least, a limited public forum, it does not make arguments as to the reasonableness of the prohibition.[20] Respondents however, as-

20. Contrary to the concurrence, *see* concurring opinion at 103, 170 P.3d at 354, the reference in

sert that the prohibition is "reasonable and viewpoint neutral." First, Respondents argue that "[t]he Hatch Act [21] and Fair Treatment provisions of HRS § 84–13 bar the display of all campaign materials on state property by anyone, and are therefore viewpoint neutral" and the "Fair Treatment provisions have been applied uniformly to all employees, including the Governor, regardless of party affiliation."

It is not necessary to examine the specific provisions of HRS § 84–13, nor is it particularly relevant whether the Ethics Commission determined, as Appellants note, that "[HRS § 84–13] does not restrict public employees from engaging in political activities." It is only necessary that the prohibition be "reasonable." *See Cornelius,* 473 U.S. at 808, 105 S.Ct. 3439.

As noted above, Respondents maintain that a "DOT supervisor observed the words 'vote for Mufi Hannemann' in a union newsletter posted on the bulletin board designated for union postings. The supervisor asked a labor relations specialist whether such postings were allowed," and "[b]ased on the State Ethics Commission fliers, the labor relations specialist indicated that campaign literature or materials could not be posted on State premises." Further, as Respondents indicate, "the State Ethics Commission was consulted, and [Mollway] confirmed the rule in HRS § 84–13 barring campaign materials on state office bulletin boards." Thus, "in light of the purpose of the forum[,]" a bulletin board for union postings, and "all of the

surrounding circumstances[,]" *id.* at 809, 105 S.Ct. 3439, including the Ethics Commission's bulletin and the opinion of the Director that posting campaign materials on the union bulletin board violated HRS § 84–13, the decision to prohibit campaign materials appears reasonable.[22] Further, Appellant does not make any discernible showing that Respondents could not reasonably draw the above conclusions.

■ As previously stated, if it can be shown that the restriction was "an effort to suppress the expression merely because public officials oppose the speaker's view," *id.* at 800, 105 S.Ct. 3439 (citation omitted), then the restriction in a non-public forum could be unconstitutional. Here, the prohibition was against all campaign materials, and not simply materials advocating a particular viewpoint. Further, the Board apparently found that Respondents were not acting to suppress HGEA's speech by restricting campaign postings because it found that there was "no evidence of Union animus." As noted above, we review findings of fact under the "clearly erroneous standard." *Bocalbos,* 93 Hawai'i at 124, 997 P.2d at 50. Appellant has not expressly contested this finding and has not presented evidence that demonstrates that this finding was clearly erroneous.[23] It cannot be concluded, then, that the postings were removed "merely" because "public officials [may have] oppose[d] the speaker's view." *Cornelius,* 473 U.S. at 800, 105 S.Ct. 3439 (citation omitted). Thus, the restriction against campaign materials on the

a footnote of the opening brief to a "reasonable basis test" posed no discernable argument as to why the *prohibition* itself, *i.e.*, HRS § 84–13, was unreasonable. Rather, Appellant rests on the breach of Article 7B of the CBA, which the concurrence acknowledges was not raised as a point of appeal. Concurring opinion at 103 n. 1, 170 P.3d at 354 n. 1.

**21.** It is not evident from Respondents' brief how the Hatch Act provisions would specifically apply in this case.

**22.** As noted above, none of the parties expressly challenge the interpretation and application of HRS § 84–13 by Mollway or his opinion that the posting of the campaign materials was prohibited by HRS § 84–13.

**23.** Contrary to the concurrence's discussion, Appellant never raised as a point of appeal that "the HLRB imposed an unconstitutional condition of employment upon [Youngquist], as an employee of the DOT." Concurring opinion at 104, 170 P.3d at 355 (internal quotation marks and brackets omitted). *See* HRAP Rule 28(b)(4) ("Points not presented in accordance with this section will be disregarded, except that the appellate court, at its option, may notice a plain error not presented."). Any remnant of this issue is subsumed in the discussion in these Parts IV through VIII addressing Appellant's first point of error. The concurrence concedes that the matter it raises was "fairly subsumed within [Appellant's] first point of error." Concurring opinion at 105, 170 P.3d at 356. That Appellant may have raised this issue before the HLRB or before the court is of no import if Appellant fails to clearly identify the issue as a point of appeal.

union bulletin board was not in violation of the First Amendment.[24]

IX.

As to issue (2), Appellant maintains that "the right of employees to engage in concerted action for 'mutual aid or protection' was violated by the State ban[.]" Appellant argues specifically that the "ban imposed on [campaign] postings and publications ... directly interferes with the statutory rights of employees under [HRS § 89–3, constituting] unlawful discrimination in violation of [HRS §§ 89–13(a)(1) and (3) ]."

To reiterate, HRS § 89–3 defines the "[r]ights of employees" in public employment and states in pertinent part:

> Employees shall have the right ... to engage in *lawful, concerted activities for the purpose of collective bargaining or other mutual aid or protection, free from interference, restraint, or coercion.* An employee shall have the right to refrain from any or all of such activities, except for having a payroll deduction equivalent to regular dues remitted to an exclusive representative as provided in section 89–4.

(Emphasis added.)

HRS § 89–13(a) provides in pertinent part as follows:

> (a) It shall be a prohibited practice for a public employer or its designated representative wilfully to:
>
> (1) *Interfere, restraint, or coerce any employee in the exercise of any right guaranteed under this chapter;*
>
> . . . .
>
> (3) Discriminate in regard to hiring, tenure, or any term or condition of employment to encourage or discourage membership in any employee organization[.]

(Emphasis added.)

■ Appellant's contention of a violation of HRS § 89–13(a)(3) is not supported by any discernable argument as to how there was discrimination "in regard to hiring, tenure, or any term or condition of employment to encourage or discourage membership in an employee organization[.]" *See State v. Bui,* 104 Hawai'i 462, 464 n. 2, 92 P.3d 471, 473 n. 2 (2004) ("Inasmuch as Defendant 'presents no discernable argument in support of this contention[,] ... it is our prerogative to disregard this claim.' " (Quoting *State v. Moore,* 82 Hawai'i 202, 206, 921 P.2d 122, 126 (1996).)). Thus, Appellant's contention under HRS § 89–13(a)(3) must be deemed waived.

X.

In regard to a violation of § 89–13(a)(1), Appellant apparently maintains that HRS § 89–3, which recognizes employees' right to "engage in lawful, concerted activities for the purpose of collective bargaining or other mutual aid or protection, free from interference, restraint, or coercion[,]" includes the right to post all union statements, including campaign materials, as was purportedly determined by the Supreme Court in *Eastex.* Thus, Appellant's argument appears to be that by banning union communications of a political nature from the HGEA's bulletin board at the DOT, Respondents committed a "prohibited practice" by "[i]nterfer[ing], restrain[ing], or coerc[ing] any employee in the exercise of any right guaranteed under this chapter[.]" HRS § 89–13(a)(1).

Appellant further asserts that "[t]he [Board's] decision totally ignores the established case precedent(s) which are dispositive of the issue under [HRS § 89–3]." Appellant argues that *Eastex* controls this issue because, in that case, the Court found an unfair labor practice where an employer prohibited "*distribution of union newsletters* which encouraged employees to write their legislators to oppose incorporation of the state 'right to work statute' into a revised constitution, warning that the incorporation would 'weaken unions and improve the edge business' has

---

**24.** Finally, Appellant maintains that there "is no compelling state interest which has been narrowly drawn." However, because it is concluded that the bulletin boards do not constitute traditional public fora or dedicated public fora, the strict scrutiny test proposed by Appellant is inapplicable. In order to withstand constitutional scrutiny in a non-public forum, all that is necessary is that the restriction meet the reasonableness and non-suppressive requirements noted above.

at the bargaining table." (Quoting *Eastex*, 437 U.S. at 569, 98 S.Ct. 2505.) (Emphasis added.) Appellant points out that, "[i]n *Eastex*, the U.S. Supreme Court held that an in-plant distribution of union newsletters by employees in non-work areas urging employees, inter alia, to vote against opponents of an increase in minimum wages had sufficient relationship to employee interests to come within the 'mutual aid and protection' clause of section 7 of the Act (29 U.S.C. § 157)." (Quoting *Eastex*, 437 U.S. at 572–73, 98 S.Ct. 2505.) Appellant further argues that "[t]he holding in *Eastex* has been specifically applied to prohibit an employer from removing union notices from bulletin boards on working premises in *Union Carbide Corp. v. NLRB*, 714 F.2d 657 (6th Cir.1983)."

The State responds that "[t]he Union's argument that the restriction on posting of campaign materials on union bulletin boards violates the right of the union to engage in 'mutual aid [or] protection' is without merit and the Union is free to distribute campaign materials to its members." The State also contends *Eastex* is inapposite because "[t]he *Eastex* case had nothing to do with the posting of campaign materials on Union bulletin boards" but instead involved a private company prohibiting a union from distributing its union newsletter to production employees and "[t]he Court held the Union was permitted to distribute the newsletter to its members, in nonworking areas in nonworking time."

Additionally, the State asserts that *Union Carbide* is inapposite because it "involve[d] nonworking areas and nonworking hours in private employment locations." It argues that the instant case is distinguishable because here, "there was no prohibition against distribution of campaign materials to Union members, and in fact, the Union concede[d] that the campaign materials were distributed to its members via the mail." The State cites to the Board's statement that it "received no evidence to show that the Union was not able to communicate directly with its general membership through mailings of political endorsement cards, fliers, [or] newsletters" for the proposition that the "one-time removal from a single State office bulletin board, which [Youngquist] selected, posted and removed, [did not infringe] on the Union's ability to educate and communicate directly with its members for their mutual aid or protection." Finally, the State relates the Board's statement that "the Union steward was informed he was 'free to continue posting any and all HGEA materials that did not include campaign materials' and the DOT 'did not review or approve [the Union steward's] postings."

In its reply brief, Appellant counters that *Eastex* is applicable to postings on bulletin boards and Respondents' contention that the decision is not applicable "misconstrues the *Eastex* holding and its applicability."

## XI.

### A.

In *Eastex*, officers of a union, "seeking to strengthen employee support for the union and perhaps recruit new members in anticipation of upcoming contract negotiations with [the] petitioner, decided to distribute a union newsletter to the petitioner's production employees." 437 U.S. at 559, 98 S.Ct. 2505 (footnote omitted). As *Eastex* explained, regarding the newsletter:

> [It] was divided into four sections. The first and fourth sections urged employees to support and participate in the union and, more generally, extolled the benefits of union solidarity. The second section encouraged employees to write their legislators to oppose incorporation of the state "right-to-work" statute into a revised state constitution then under consideration, warning that incorporation would "weake[n] Unions and improv[e] the edge business has at the bargaining table." The third section noted that the President recently had vetoed a bill to increase the federal minimum wage from $1.60 to $2.00 per hour, compared this action to the increase of prices and profits in the oil industry under administration policies, and admonished: *"As working men and women we must defeat our enemies and elect our friends.* If you haven't registered to vote, please do so today."

*Id.* at 559–60, 98 S.Ct. 2505 (emphasis added).

Representatives of Eastex refused to permit the requested distribution and the union filed on unfair labor practice charge with the National Labor Relations Board (NLRB), maintaining that the refusal interfered with the employees' rights under § 7 of the National Labor Relations Act (NLRA). *Id.* at 560–61, 98 S.Ct. 2505. Section 7, like HRS § 89–3, provides that "[e]mployees shall have the right ... to engage in ... concerted activities for the purpose of collective bargaining or other mutual aid or protection[.]" *Id.* at 563, 98 S.Ct. 2505 (footnote omitted). The NLRB found in favor of the union. *Id.* at 561, 98 S.Ct. 2505. On certiorari before the Court, Eastex challenged the distribution of the newsletter as to the second and third sections, admitting that it had no objection to the first and fourth sections of the newsletter. *Id.* at 561–62, 98 S.Ct. 2505.

### B.

The Court explained that the applicable test for determining whether a refusal to allow distribution of the newsletter violated the "mutual aid or protection clause" was (1) "whether, apart from the location of the activity, distribution of the newsletter is the kind of concerted activity that is protected from employer interference by §§ 7 and 8(a)(1) of the [NLRA]," *id.* at 563, 98 S.Ct. 2505 (citations omitted), and if that answer was yes then (2) whether "the fact that the activity takes place on petitioner's property gives rise to a countervailing interest that outweighs the exercise of § 7 rights in that location[,]" *id.* (citations omitted).

As to (1), the Court explained "it has been held that the 'mutual aid or protection' clause protects employees from retaliation by their employers when they seek to improve working conditions through resort to administrative and judicial forums and that employees' appeals to legislators to protect their interests as employees are within the scope of this clause." *Id.* at 565–66, 98 S.Ct. 2505 (citations and footnotes omitted). The Court also noted that "[i]t is true, of course that some concerted activity bears a less immediate relationship to employees' interest as em-

ployees than other such activity" and "[w]e may assume that at some point the relationship becomes so attenuated that an activity cannot fairly be deemed to come within the 'mutual aid or protection' clause." *Id.* at 567–68, 98 S.Ct. 2505.

■ However, in analyzing whether the clause was violated, it stated that "[f]ew topics are of such immediate concern to employees as the level of their wages" and that "[t]he union's call ... for these employees to back persons who support an increase in the minimum wage, and to oppose those who oppose it, fairly is characterized as concerted activity for the 'mutual aid or protection' of [Eastex's] employees and of employees generally." *Id.* at 569–70, 98 S.Ct. 2505. Similarly here, Appellant's materials advocating for candidates who support the union interests and opposing those candidates who oppose union interests are protected under Hawaiʻi "mutual aid or protection" clause. *See* HRS § 89–3.

### C.

■ Because *Eastex* answered (1) in the affirmative, it was necessary to reach the second question of "whether the Board erred in holding that [Eastex's] *employees may distribute the newsletter in nonworking areas of petitioner's property during nonworking time.*" *Id.* at 570, 98 S.Ct. 2505 (emphasis added). The Court compared the case to *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945), which had determined that "an employer may not prohibit its employees from distributing union organizational literature in nonworking areas of its industrial property during nonworking time[,]" *Eastex*, 437 U.S. at 570–71, 98 S.Ct. 2505 (citing *Republic Aviation, supra*), and held similarly that the same rule applied because Eastex's "employees [also] sought to distribute literature in nonworking areas of their employer's industrial property during nonworking time[,]" *id.* at 572, 98 S.Ct. 2505.

The instant case does not conflict with *Eastex*. The campaign materials at issue were posted on a specific union bulletin board located on the fourth floor of the

DOT's office building, apparently at the working place. The bulletin board, although designated for union use, was on State premises for purposes of HRS § 84–13, and Appellant apparently indicates it was a "workplace bulletin board." Appellant makes no argument that the materials were only displayed during nonworking hours, and, thus, the materials appear to have been posted during both "working" and "nonworking" hours.

## XII.

### A.

Appellant argues that *Union Carbide* construes *Eastex* as prohibiting an employer from removing union notices from bulletin boards on working premises. *Union Carbide* involved Union Carbide's Oak Ridge facilities "which employ[ed] approximately 11,000 salaried workers, none of whom [were] represented by a union." 714 F.2d at 659. During a "particularly aggressive representation campaign directed at the [employees,]" several unions sought to organize some or all of the workers. *Id.* A Union Carbide supervisor persisted in removing one union's "open house" notices from a particular bulletin board. *Id.* at 660.

The *Union Carbide* court explained that where a company makes an employee bulletin board available for employees to use freely for any purpose, it must also allow employees to post union materials.

> The Labor Management Relations Act does not afford employees a protectable interest in the use of an employer's bulletin board. NLRB v. Container Corp. of Am., 649 F.2d 1213 (6th Cir.1981) (per curiam). See also Nugent Services[Service], Inc. [v. Vellani], 207 N.L.R.B. 158[, 1973 WL 4584] (1974). Nevertheless, where, by policy or practice, the company permits employee access to bulletin boards for any purpose, section 7 of the Act, 29 U.S.C. section 157, secures the employees' right to post union materials. NLRB v. Challenge–Cook Bros. of Ohio, Inc., 374 F.2d 147 (6th Cir.1967). Cf. NLRB v. Container Corp., supra (enforcing N.L.R.B. decision which held that although

there was no statutory right to use the bulletin board, once an employer permitted access to a company board, it could not thereafter remove notices or discriminate against an employee who posted union notices). The content of such notices is protected by the Act even if abusive and insulting. Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers, AFL–CIO v. Austin, 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974); NLRB v. Container Corp., 649 F.2d at 1215. Notwithstanding the foregoing, however, is the employer's legitimate property interests and concern for the maintenance of order; accordingly, where the bulletin boards threaten to become a "battleground for competing groups", regulation of the posted materials is proper. See Nugent Services[Service], Inc. To hold otherwise would "be unduly prejudicial to the company's property and management rights."

*Id.* at 660–61 (emphases added) (internal citation omitted).

*Union Carbide* further explained that "[t]he employee right to discuss self-organization extends to the posting of notices on company bulletin boards where, as here, the company has waived its right of exclusive control over the medium." *Id.* at 661 (internal quotation marks omitted). Additionally, the Sixth Circuit Court of Appeals concluded that "use of the bulletin boards to post notices of the campaigning union's open house events did not infringe on any legitimate company concern[.]" *Id.*

### B.

The instant case also does not conflict with *Union Carbide.* First, in that case, the company had "permit[ted] employee access to [the] bulletin boards for any purpose." *Id.* at 660. The State provided the space to the union "for posting of usual and customary union notices" pursuant to Article 7B of the BU 3 contract. HGEA remained "free to continue posting any and all HGEA materials on DOT's bulletin board that did not include campaign materials" and those postings did not have to be "review[ed] or approve[d]."

However, as *Union Carbide* indicated, a company could prohibit certain materials where the materials "infringe[d]" on a "legitimate company concern." *Id.* at 661. Here, analogous to the "legitimate company concern" in *Union Carbide*, the State, as an employer, expressed a "legitimate" concern with campaign postings, inasmuch as supervisors at the DOT believed them to be in violation of statutory law, HRS § 84–13, and the Ethics Commission bulletin, and there was no Board finding of "union animus." [25]

## XIII.

Appellant does not state directly how *Evanston Firefighters Ass'n, Local 742 v. Illinois State Labor Relations Bd.*, 241 Ill. App.3d 725, 182 Ill.Dec. 256, 609 N.E.2d 790 (1993), relates to the case at hand, but argues that "[t]he issue of whether government can restrict the activities of a public employee based on a law which prohibits the employee from using his or her public 'office and title' to promote a [political action committee] program of a union during an election campaign was squarely addressed" in that case. *Evanston Firefighters* involved members of a firefighter's union who participated in a union-created political action committee (FIRE–PAC) whose "goal was to meet the need for sound political education and action among the members of Local 742." *Id.* at 257, 609 N.E.2d at 791.

Before an election FIRE–PAC members engaged in a door-to-door and telephone canvassing event on behalf of a particular candidate. *Id.* at 258, 609 N.E.2d at 792. Members who participated were instructed not to identify themselves as city employees but as members of a political action committee associated with the Firefighters Association. *Id.* During the canvas, the city manager received a telephone call from a citizen who claimed that an individual identifying himself as a city employee had come to his door campaigning for a particular candidate. *Id.* The city manager issued a memorandum reminding employees that using their title or office during political activity was prohibited.[26] *Id.*

*Evanston Firefighters* emphasized that the only issue before it "was whether the memorandum constituted an unfair labor practice." *Id.* at 260, 609 N.E.2d at 794. The Illinois statute identifying the rights of State employees is substantially the same as HRS §§ 89–3 and 89–13(a)(1) and states, in part, that employees of the state have the right "to engage in other concerted activities not otherwise prohibited by law for the purposes of collective bargaining or other mutual aid or protection, free from interference, restraint or coercion." *Id.* at at 261, 609 N.E.2d at 795 (citing Ill.Rev.Stat.1989, ch. 48, par. 1606(a)).

The Illinois appellate court ruled that it could not "accept the Board's conclusion that the mere fact that a city employee identifies his position represents a use of his title or position to coerce or influence another person" and "[t]here is, in short, no logical justification for prohibiting city employees from merely identifying themselves as such." *Id.* at 263, 609 N.E.2d at 797. Thus, the court concluded that the memorandum was an un-

---

**25.** Again, Appellant does not expressly appeal the Board's application of HRS § 84–13. Thus, it is presumed for purposes of this issue that Appellant's posting of campaign materials violated HRS § 84–13.

**26.** The memorandum stated in pertinent part as follows:

This week I received a complaint that someone, who identified himself as a city employee, was calling on residents in their homes to encourage a vote for a particular aldermanic candidate. That person, if he is in fact a city employee, violated the Civil Service Ordinance, the Code of Ethics, and the Personnel Rules of the City of Evanston by using his official city office and title while engaging in political activity after work hours.

The Civil Service Ordinance and the Personnel Rules both contain the following provision: "No employee of the City shall engage in political activity during working hours or while on City premises in any city-connected function, or use their official city office or title while engaging in political activities [after] working hours."

The Code of Ethics provides that:

"No non-elective employee shall use the prestige of his position on behalf of any political party or for any political purpose."

Each employee of the City is subject to these provisions.

182 Ill.Dec. at 258–59, 609 N.E.2d at 792–93.

fair labor practice. *Id.* at 263–64, 609 N.E.2d at 797–98.

*Evanston Firefighters* is both distinguishable and quoted incorrectly. First, the circumstances in that case were markedly different from the instant case as they involved public employees "canvassing" an area, making phone calls or going door-to-door, thus campaigning for a candidate outside of the work premises and not during work hours. As previously noted, the instant case concerns a bulletin board on work premises with materials displayed during working hours.

Further, *Evanston Firefighters* did not, as Appellant argues, hold that it was an unfair labor practice to "prohibit[ ] the employee from using his or her public 'office and title' to promote a Political Action Committee ... program of a union during an election campaign[.]" Rather, that court held that the memorandum was not a correct interpretation of the statute to which it referred. *Id.* at 264, 609 N.E.2d at 798 (cautioning that the holding was "a narrow one"). The Illinois court stated that "a blanket proscription against all city employees identifying their positions, regardless of the circumstances, is not supported by the language of the City's ordinance." *Id.* (emphasis omitted). Thus, *Evanston Firefighters* did not, as Appellant suggests, determine whether such a statute, if it had existed, would be lawful. In sum, the removal of campaign materials from the union bulletin board, under the circumstances of this case, did not infringe on the "mutual aid or protection" clause of HRS § 89–3.

## XIV.

As to issue (3), Appellant argues that (a) "the Board ... acted in excess of its statutory authority by interpreting and applying [HRS] chapter 84, and deciding questions expressly reserved for the State Ethics Commission instead of limiting itself to deciding whether there was a violation of [HRS] chapter 89," and (b) "[b]y substituting itself as the ethics commission the [Board] usurped the exclusive jurisdiction of the commission, and created a statutory defense not

27. *See supra* note 6.

afforded in chapter 89 or under [HRS § ]84–13[.]"

With respect to Appellant's argument (3)(a), the Intermediate Court of Appeals has observed that "[a]n administrative agency can only wield powers expressly or implicitly granted to it by statute. Implied powers are limited to those reasonably necessary to make an express power effective." *TIG Ins. Co. v. Kauhane,* 101 Hawai'i 311, 327, 67 P.3d 810, 826 (App.2003) (internal quotation marks, brackets, and citations omitted). The Board has "exclusive original jurisdiction" over "[a]ny controversy concerning prohibited practices[.]"[27] HRS § 89–14. Thus, the Board has express power over "*[a]ny* controversy concerning prohibited practices[,]" *id.* (emphasis added), and also those powers which are "*reasonably necessary* to make [this] express power effective[,]" *Kauhane,* 101 Hawai'i at 327, 67 P.3d at 826 (emphasis added) (internal quotation marks, brackets, and citations omitted).

Also, the Board is mandated to "*[c]onduct proceedings on complaints of prohibited practices* by employers, employees, and employee organizations *and take such actions with respect thereto as it deems necessary and proper*[.]" HRS § 89–5(i)(4) (Supp.2006) (emphases added). The Board is additionally authorized to

> *[h]old such hearings and make such inquiries, as it deems necessary, to carry out properly its functions and powers,* and for the purpose of such hearings and inquiries, administer oaths and affirmations, examine witnesses and documents, *take testimony and receive evidence,* compel attendance of witnesses and the production of documents by the issuance of subpoenas, and delegate such powers to any member of the board or any person appointed by the board for the performance of its functions[.]

HRS § 89–5(i)(5) (Supp.2006) (emphases added). Consequently, in deciding prohibited practice complaints, the Board is vested with the power "reasonably necessary," *Kauhane,* 101 Hawai'i at 327, 67 P.3d at 826 (internal quotation marks, brackets, and cita-

tions omitted), to effectuate resolution of such complaints. In that regard, as stated before, it may take actions "necessary and proper" in the conduct of the proceedings and make inquiries "necessary" to decide the controversies. HRS §§ 89–5(i)(4) & (5).

XV.

With respect to its argument (3)(b), Appellant contends that the Board should have "limit[ed] itself to deciding whether there was a violation of chapter 89." According to Appellant, because "[t]here is no reference in [HRS] chapter 89 to [HRS] chapter 84[,] the [Board] has no jurisdiction over questions of ethics arising under [HRS] chapter 84, which are expressly reserved for the State Ethics Commission under [HRS § ]84–31 [ (Supp. 2006) ]." [28] Appellant thus asserts that, "[b]y substituting itself as the ethics commission, the [Board] ... usurped the exclusive jurisdiction of the commission, and created a statutory defense not afforded in [HRS] chapter 89 or under [HRS § ]84–13[.]"

28. HRS § 84–31, entitled "Duties of commission; complaint, hearing, determination," states in relevant part:
 (a) The ethics commission shall have the following powers and duties:
 ....
 (2) *It shall render advisory opinions* upon the request of any legislator, employee, or delegate to the constitutional convention, or person formerly holding such office or employment *as to whether the facts and circumstances of a particular case constitute or will constitute a violation of the code of ethics.* If no advisory opinion is rendered within thirty days after the request is filed with the commission, it shall be deemed that an advisory opinion was rendered and that the facts and circumstances of that particular case do not constitute a violation of the code of ethics. The opinion rendered or deemed rendered, until amended or revoked, shall be binding on the commission in any subsequent charges concerning the legislator, employee, or delegate to the constitutional convention, or person formerly holding such office or employment, who sought the opinion and acted in reliance on it in good faith, unless material facts were omitted or misstated by such persons in the request for an advisory opinion;
 ....
 (6) *It shall have jurisdiction for purposes of investigation and taking appropriate action on alleged violations of this chapter in all*

In its complaint, Appellant alleged that in removing the posted campaign materials, Respondents "unlawful[ly] interfere[d] with the rights of public employees to engage in protected concerted action ..., free of interference, restraint, or coercion in connection with an ongoing dispute with [Lingle]." However, the State recounts that its "sole motivation in requesting that the HGEA remove the campaign materials from the bulletin board was to comply with the Hawai'i State Ethics Code[,]" HRS chapter 84. Because the State expressly based its actions on the Hawai'i State Ethics Code, the question of whether there was a prohibited practice violation under the circumstances of this case, implicated the Code.

Accordingly, in exercising its jurisdiction to decide the Complaint, the Board was empowered to make such inquiries "as it deem[ed] necessary and proper[,]" HRS § 89–5(i)(4), with respect to the application of the Ethics Code. Thus, during the hearing regarding Appellant's Complaint, the Board received the testimony of Mollway,[29] pursuant to HRS § 89–5(i)(5). In doing so, the

 *proceedings commenced within six years of an alleged violation of this chapter by a legislator or employee or former legislator or employee.* A proceeding shall be deemed commenced by the filing of a charge with the commission or by the signing of a charge by three or more members of the commission. Nothing herein shall bar proceedings against a person who by fraud or other device, prevents discovery of a violation of this chapter[.]
(Emphases added.)

29. As indicated *supra* at note 28, the Ethics Commission has "jurisdiction for purposes of investigation and taking appropriate action on alleged violations of [HRS chapter 94] in all proceedings commenced within six years of an alleged violation ... by a[n] ... employee." HRS § 84–31(a)(6). In relation to its issue (1), Appellant states that "the Board's reliance on 'flyers' prepared by and testimony offered by Mollway are inapposite. Jurisdiction to determine alleged violations of [HRS § 84–13] is vested in the State Ethics Commission (not Mollway or the HLRB)." However, the parties do not appear to take issue as to this point in connection with issue (3). In any event, it may be noted that the Board was authorized to make such inquiry as it believed reasonably necessary, Appellant did not object to receipt of Mollway's testimony, and Mollway indicated a response from the Commission would not be forthcoming. *See* discussion herein.

Board was empowered by its authority "to take such actions with respect" to the "conduct [of] proceedings on complaints of practices" as "it deem[ed] necessary and proper." *Id.*

 It should be noted that Appellant did not contest the Board's receipt of Mollway's testimony at the Board, before the court, or to this court. In such a case Appellant waived any objection to the receipt of such testimony. *See Lee v. Elbaum,* 77 Hawai'i 446, 453, 887 P.2d 656, 663 (App.1993) (holding that because "[p]laintiffs' counsel did not object to [the witness'] testimony until after [the witness] had been questioned on direct examination, cross-examination and re-direct examination" and "no motion to strike [the witness's] testimony was made until two days later, after the defense had already rested its case and the court had already determined the instructions to be submitted to the jury[,] ... [the p]laintiffs' objection to [the witness's] testimony was untimely and was thus waived for appeal purposes").

Moreover, to reiterate, it is "a prohibited practice for a public employer or its designated representative wilfully to" engage in an act enumerated in HRS § 89-13. With respect to HRS chapter 89, this court has said that "wilfully" means "conscious, knowing, and deliberate intent to violate the provisions of HRS chapter 89." *Aio v. Hamada,* 66 Haw. 401, 410, 664 P.2d 727, 734 (1983). Thus, in assessing a violation of HRS § 89-13, the Board was required to determine whether Respondents acted with the "conscious, knowing, and deliberate intent to violate the provisions" of HRS chapter 89 when it removed the campaign materials. Respondents assert that they did not act wilfully, but acted to comply with the Ethics Code. Hence, again, in order to fulfill its duty to decide the Complaint, the Board was required to determine the relevance of the Ethics Code.

It follows then, that in order to determine whether a prohibited practice occurred, the Board was necessarily required to decide the application of HRS § 84-13 under the circumstances posed by Appellant's complaint. *See also Fed. Trade Comm'n v. Raladam Co.,* 283 U.S. 643, 649, 51 S.Ct. 587, 75 L.Ed. 1324 (1931) ("Official powers cannot be extended beyond the terms and *necessary implications* of the grant." (Emphasis added.)). Because the determination of such an application falls within the powers accorded the Board, the Board acted within its jurisdiction in receiving evidence concerning the Code.

### XVI.

Although an application of HRS § 84-13 was necessary to decide Appellant's Complaint under HRS § 89-13, it cannot be said that the question arose under HRS chapter 84, as Appellant contends. Appellant filed the Complaint with the Board pursuant to HRS § 89-19. The Board has "exclusive original jurisdiction" to determine prohibited practice complaints. HRS § 89-14. Therefore, the Ethics Commission would not have had jurisdiction to make such a determination.

Moreover, as indicated previously, in his written opinion to the Board dated January 3, 2005, Mollway stated that the prohibition of posting campaign materials pursuant to HRS § 84-13 "falls within prior Commission rulings regarding campaigning and the use of state resources," and, thus, the Commission did not need to decide the issue: [30]

Finally, *in a letter from our office to you dated December 8, 2004, I indicated that this matter was complex and would need to be taken to the State Ethics Commission for an opinion, which I indicated might take several months to issue. However,* after considering this matter from the time of its inception in October, and in depth after December 8, *it is my belief that the*

30. As noted before, on October 18, 2004, the DOT sent a letter to the Ethics Commission asking whether the State could "pull" the items that were posted on the employee bulletin board or whether it should "put [the items] back up," and on November 9, 2004 and December 3, 2004, the Attorney General requested a "written response"

on "whether the ... campaign materials on the office bulletin boards" was a "violation of HRS [c]hapter 84, Standards of Conduct." It is not argued that these letters, sent to the Ethics Commission, constituted requests for advisory opinions. *See* HRS § 84-31(a)(2).

*above opinion falls within prior Commission rulings regarding campaigning and the use of state resources, and thus I believe this letter can be issued at this time.*

(Emphases added.) Because Mollway indicated his opinion fell "within prior Commission rulings," it does not appear the Ethics Commission would have taken any further action on the matter. It should be noted that none of the parties expressly challenge the interpretation and application of HRS § 84–13 by Mollway or his opinion that the posting of the campaign materials was prohibited by HRS § 84–13.[31]

## XVII.

Appellant relies on *LTV Steel Co. v. Griffin*, 730 N.E.2d 1251 (Ind.2000). In that case, the Supreme Court of Indiana held that in dismissing an employer's series of alleged violations of the Indiana Occupational Safety and Health Act (IOSHA) after deciding that the issuing inspector violated the State Ethics Code, the Safety Board exceeded its statutory jurisdiction. *Id.* at 1257 (citation omitted). The Indiana court noted that "[t]he Safety Board resolved [the] case by adjudicating [the inspector] to have had a 'financial interest' " in violation of the code but that the Safety Board was not authorized to rule on the ethics violation. *Id.* at 1258. The *Griffin* court concluded that such an adjudication was "within the exclusive jurisdiction of the Ethics Commission." *Id.*

That court observed that there were "[a]t least two policy reasons for entrusting such determinations exclusively to the Ethics Commission[.]" *Id.* at 1259. First, "[i]f each state agency were to issue its own interpretations of what, say, constituted an impermissi-

ble financial interest, the standards would inevitably vary from agency, to agency[,]" which "would make compliance unnecessarily difficult, especially for employees who are reassigned among agencies or who may perform responsibilities for more than one." *Id.* *Griffin* observed "a sense of such inconsistency ... where the Safety Board, the trial court, and the Court of Appeals each tried their respective hands at interpreting the meaning of 'financial interest' in the Ethics Code with varying results." *Id.* The second policy reason articulated, but not directly implicated by the facts of *Griffin*, was "entrusting such determinations to a single agency assures consistency in the application of due process rights of alleged violators." *Id.* (footnote omitted).

Although the State does not address the relevance of this case, *Griffin* is distinguishable. Unlike the instant case where the application of HRS § 84–13 was necessary to the resolution of the Complaint, in *Griffin*, the inspector's purported violation of the State Ethics Code was not related to the employer's alleged IOSHA violation. Thus, an adjudication of the State Ethics Code violation by the Safety Board was not directly implicated by the alleged IOSHA violation.

In addition, the policy concerns articulated by the *Griffin* court are not present here. In this case, the Board received and relied heavily on the testimony of Mollway, who, as noted, was the Executive Director and General Counsel of the Ethics Commission, as to the applicability of HRS § 84–13. As stated in Mollway's January 3, 2005 letter, his opinion as to HRS § 84–13's prohibition against the posting of the campaign materials fell "within prior Commission rulings regarding campaigning and the use of state re-

---

**31.** It should noted, however, that in a footnote, Appellant states:

> Substantively, the State Ethics Commission's opinions indicate that [HRS § 84–13] was never intended to 'deprive the individual state employees of a basic right to participate in political campaigns.' The State Ethics Commission in Advisory Opinion No. 2000–1 found no violation of [HRS § 84–13] when HGEA and other union members were released to attend 'information and educational meetings' held one day prior to the elections of 1998 during which union officials praised a state candidate for re-election during the two hour

event, and the candidate informed state employees in attendance that if re-elected, he would work to get funding for the negotiated pay raises for public workers.

Appellant stated the same before the court. The court made no findings as to this specific point and, thus, by implication, rejected it. Nevertheless, it would appear that the posting of campaign materials on a bulletin board in a public building, even though reserved for Union notices, differs markedly from releasing employees to attend a union meeting at which election matters were discussed.

sources[,]" and, thus, it did not appear that the Commission would issue any further opinions. Hence, there was no concern of a varied or inconsistent interpretation of HRS § 84–13 among different agencies. And as observed *supra*, Appellant does not expressly contest the Board's interpretation of HRS § 84–13.

The *Griffin* court's second policy reason regarding the application of due process rights was also not implicated by the facts of this case. Here, Appellant was not adjudged to have violated the Ethics Code by the Ethics Commission and, thus, was not subject to penalties for having violated the Ethics Code.

It should be noted that in addition, the *Griffin* court "conclude[d] that even if [the issuing inspector] had been properly found by the [e]thics [c]ommission to have had an impermissible financial interest in [the employer], such a finding would not have provided [the employer] with a statutory basis for dismissal of the safety orders" because there was no authority that suggested that "a state ethics violation by an inspector serv[es] as a defense to allegations of serious workplace safety violations." *Id.* (footnote omitted). However, in this case, the finding of the Ethics Code violation provided a basis for dismissal of the prohibited practice complaint inasmuch as it negated the "willfully" mental state which is required under HRS § 89–13.

Moreover, Appellant's contention that "courts in other jurisdictions similarly have held that where the legislature gave one administrative body authority over a subject matter to the exclusion of another agency, the other administrative body possessed no authority to decide on that matter"[32] is unpersuasive under the circumstances. (Citations omitted.) As discussed *supra*, the Board necessarily had the power to apply HRS § 84–13 in order to decide whether a

prohibited practice violation actually occurred. Therefore, the Board did not exceed its jurisdiction in ruling that a prohibited practice violation did not occur based on the application of HRS § 84–13. *Cf. Honda v. Bd. of Trs. of the Employees' Ret. Sys.*, 108 Hawai'i 338, 346, 120 P.3d 237, 245 (2005) (where the court recently clarified that it was not requiring the trustees of the employees retirement system to act 'outside its statutory mandate' under HRS chapter 88); *Morgan v. Planning Dept., County of Kauai*, 104 Hawai'i 173, 188, 86 P.3d 982, 997 (2004) (where the legislature empowered the courts to issue injunctions, the planning commission had no authority to require property owners to conduct a sand replenishment program).

## XVIII.

As to issue (4), Appellant contends that (a) "the contractual right to post notices and publications on union bulletin boards within the state (and county) buildings was expressly authorized by [HRS § 89–3] as a part of the right of employees to engage in protected concerted activity for 'their mutual aid [or] protection'" and "[t]he Board ... erred by considering the contractual provision only, without examining the statutory basis for that right," and (b) "the provisions of [HRS § 84–13] are in direct conflict with the exercise of statutory rights by [Youngquist] (and other public employees) as provided for in [HRS § 89–3.]"

### A.

As to Appellant's argument (a), pursuant to HRS § 89–3, "[e]mployees shall have the right ... to engage in *lawful*, concerted activities[.]" (Emphasis added.) By its plain and express language, however, HRS § 89–3 only protects those concerted activities that are "lawful." *See Blaisdell v. Dep't of Pub. Safety*, 113 Hawai'i 315, 318–19, 151 P.3d 796,

---

**32.** Appellant cites to *Dyna–Med, Inc. v. Fair Employment & Hous. Comm'n*, 43 Cal.3d 1379, 241 Cal.Rptr. 67, 743 P.2d 1323, 1333 (1987) (noting that in deciding remedial powers of agency, the legislative intent to limit the authority of one agency was found in legislation that empowered one agency to award damages while not similarly empowering another agency); *Bell v. State Bd. of Tax Comm'rs*, 651 N.E.2d 816 (Ind.Tax 1995)

(tax agency lacked authority to decide if school construction project was necessary from educational standpoint); *Miller v. Gibson County Solid Waste Mgmt. Dist.*, 622 N.E.2d 248, 259–60 (Ind.Tax 1993) (stating that "no administrative agency has the prerogative to make decisions properly committed to any other agency"); and *Branderhorst v. Iowa State Highway Comm'n*, 202 N.W.2d 38, 40–41 (Iowa 1972).

799–800 (2007) (stating that " 'where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning' " (quoting *State v. Kalama*, 94 Hawai'i 60, 64, 8 P.3d 1224, 1228 (2000) (other citations omitted))). Because under the circumstances of this case, the posting is prohibited by HRS § 84–13, it is not lawful, and is therefore not protected under the express language of HRS § 89–3. With respect to the specific language of Article 7B, this court has said that "a public employer is not free to bargain with respect to a proposal which would authorize a violation of a statute." *SHOPO*, 83 Hawai'i at 405, 927 P.2d at 413. Thus, assuming, *arguendo*, that Article 7B allowed for the posting of the campaign materials, inasmuch as the posting was prohibited by HRS § 84–13, it was not allowable under HRS § 89–3. Therefore, even if the Board examined the statutory basis for Article 7B, it would be bound by the fact that the postings were not protected under HRS § 89–3.

### B.

As to Appellant's argument (b), Appellant apparently alleges that HRS §§ 89–3 and 84–13 are conflicting statutes concerning the subject matter of HRS chapter 89 and, thus, HRS § 89–3 should take precedence over HRS § 84–13. It should be noted that Appellant does not set forth a basis for this "direct conflict." However, it appears that at least for purposes of this issue, Appellant has accepted the proposition that the posting of campaign materials on the DOT bulletin board violated HRS § 84–13. For if Appellant argued that HRS § 84–13 allowed the posting of such materials, there could be no "direct conflict," as Appellant asserts. Furthermore, Appellant does not expressly appeal the Board's application of HRS § 84–13. Thus, it is presumed for purposes of this issue that Appellant's posting of campaign materials violated HRS § 84–13.

HRS § 89–19 states that HRS chapter 89 "shall take precedence over all conflicting statutes concerning this subject matter." In *SHOPO*, this court held that

it is the provisions of HRS chapter 89 itself—and not those of [a] CBA—that are accorded *preemptive effect against all other conflicting statutes on the same subject matter*. By its own language, HRS § 89–19 accords preemptive effect to the provisions of HRS chapter 89 and not to the agreements entered into between parties pursuant to the authority, procedures, and rules established in HRS chapter 89.

*SHOPO*, 83 Hawai'i at 403, 927 P.2d at 411 (emphasis added) (citing HRS § 89–19 (stating that "*[t]his chapter* shall take precedence over all conflicting statutes" (emphasis added))); *see also Hoopai*, 106 Hawai'i at 223, 103 P.3d at 383 (concluding that *SHOPO* was distinguishable because "the disputed [CBA] provisions [were] specifically authorized by [provisions in HRS chapter 89]"). Assuming, *arguendo*, that the statutes concern the same subject matter, HRS §§ 89–3 and 84–13 cannot be said to conflict, as Appellant contends. *See SHOPO*, 83 Hawai'i at 402, 927 P.2d at 410 ("Nothing in HRS Chapter 89 is explicitly contrary to, or inconsistent with, any of the provisions of HRS Chapter 92F. Specifically, HRS Chapter 89 does not require the confidentiality of any information that must be made publicly accessible under HRS Chapter 92F.") To reiterate, as applied in this case HRS § 84–13 prohibits the posting of the campaign materials, and nothing in HRS Chapter 89 "is explicitly contrary to, or inconsistent with" that construction. *Id.* Because there is no conflict between HRS §§ 89–3 and 84–13, Appellant's argument that "[w]here collective bargaining rights conflict with the provisions of other statutes courts have recognized that public sector statutes supercede the conflicting provisions of other statutes" is inapposite to this case.[33] (Citations omitted.) In light of the forego-

**33.** Appellant cites *City of Golden v. Ford*, 141 Colo. 472, 348 P.2d 951 (1960) (municipal ordinances in conflict with labor peace act are without force or effect); *Health Emp. Labor Program v. County of Cook*, 236 Ill.App.3d 93, 177 Ill.Dec. 521, 603 N.E.2d 591, 593 (1992); *City of Spokane v. Spokane Police Guild*, 87 Wash.2d 457,

553 P.2d 1316 (1976) (applying Revised Code of Washington § 41.56.905 to find provisions of collective bargaining act supersede general municipal powers statute); and *Wis. Employment Relations Comm'n v. Teamsters Local No. 563*, 75 Wis.2d 602, 250 N.W.2d 696 (1977) (applying section prospectively for state employees only).

ing, Respondents' argument regarding the applicability of the federal Hatch Act, and Appellant's argument in reply, need not be reached

### XIX.

Based on the foregoing, the court's February 13, 2006 judgment is affirmed.

Concurring Opinion by LEVINSON, J., with whom MOON, C.J., joins.

I concur in the result that the majority reaches but, in the interest of thoroughness, write separately to address two arguments that were, in my view, properly raised by the complainant-appellant Hawaii Government Employees Association (the HGEA), yet not considered by the majority.

### I. *THE HAWAI'I DEPARTMENT OF TRANSPORTATION'S EMPLOYEES ACTED REASONABLY IN RESTRICTING THE HGEA'S POSTING OF POLITICAL CAMPAIGN MATERIALS ON THE BULLETIN BOARD.*

The majority concludes, I believe inaccurately, that "because [the HGEA] is convinced that the bulletin boards constitute, at the very least, a limited public forum, it does not make arguments as to the reasonableness of the prohibition." Majority opinion at 90, 170 P.3d at 341. In fact, in a footnote in its opening brief, the HGEA argues that the restriction against posting campaign materials on the bulletin board does not "satisfy a 'reasonable' basis test, since the restriction and limitation imposed is contrary to the purpose for which union bulletin boards were created."[1] The purpose of the bulletin board, according to the HGEA, is for "union representational purposes" allowed for under both article 7.B of the HGEA's collective bargaining agreement and Hawai'i Revised Statutes (HRS) § 89–3 (Supp.2006).

### A. *The HGEA's Reasonableness Argument Is Discernable.*

The majority contends that "the reference in a footnote of the opening brief to a 'reasonable basis test' posed no discernable argument as to why the *prohibition* itself, *i.e.*[,] HRS § 84–13, was unreasonable" and that the HGEA instead "rests on the breach of Article 7B of the collective bargaining agreement." Majority opinion at 90–91 n. 20, 170 P.3d at 341–42 n. 20 (emphasis in original).

The HGEA, however, does more than just cite a test; it applies the test by arguing that article 7.B of the collective bargaining agreement and HRS § 89–3 inform the purpose of the forum and, thus, the reasonableness of the restriction. Specifically, the HGEA maintains that:

The state ban in this present case does not even satisfy a "reasonable" basis test, since the restriction and limitation imposed is contrary to the purpose for which union bulletin boards were created and in violation of the contractual commitment made to [the] HGEA.... "The State may not exclude speech where its distinction is not 'reasonable in light of the purpose served by the forum[.]'" [*Rosenberger v. Rector & Visitors of the Univ. of Va.,*] 515 U.S. [819,] 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 [ (1995) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,* 473 U.S. 788, 809, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985)).] The purpose of a union bulletin board in [article] 7B is for union representational purposes under Section 89–3, HRS.

(Some brackets added and some in original.)

Moreover, as the language of the HGEA's argument demonstrates, the HGEA goes further than simply asserting that article 7.B was breached by the state; it also contends that the article speaks to the purpose of the forum. In particular, the HGEA argues that "the restriction and limitation imposed is [ (1) ] contrary to the purpose for which un-

---

1. The HGEA also asserts in its reasonableness argument that the restriction on posting campaign materials violates "the contractual commitment made to [the] HGEA" under section 7B of its collective bargaining agreement, but does not raise the breach of contract issue that was addressed below, as a point of error on appeal.

Because the HGEA does not properly present this contention, I do not address it. *See* Hawai'i Rules of Appellate Procedure Rule (HRAP) 28(b)(4) ("Points not presented in accordance with this section will be disregarded, except that the appellate court, at its option, may notice a plain error not presented.").

ion bulletin boards were created," as evidenced by article 7.B., "*and* [ (2) ] in violation of the contractual commitment made to [the] HGEA." (Emphasis added.) The conjunctive "and" establishes that the HGEA's argument is not narrowly confined to the issue of breach, as the majority maintains, *see* majority opinion at 90–91 n. 20, 170 P.3d at 341–42 n. 20, but rather extends to the purpose of the forum. Hence, while I find the HGEA's reasonableness argument ultimately unpersuasive, I believe that the argument is indeed discernable.

### B. *The HGEA Has Not Shown That The Restriction Is Unreasonable In Light Of The Forum's Purpose.*

Article 7.B of the collective bargaining agreement states that the HGEA "shall be provided adequate space on bulletin boards for posting of usual and customary Union notices." And HRS § 89–3 grants employees the right "to engage in lawful, concerted activities for the purpose of collective bargaining or other mutual aid or protection, free from interference, restraint, or coercion.". Thus, one of the forum's purposes is to facilitate the HGEA's lawful communication with its members through bulletin board notices.

Nevertheless, as the majority correctly observes, the forum is located in a Hawai'i Department of Transportation (DOT) office building and is, therefore, subject to HRS § 84–13 (1993),[2] which, as interpreted by Hawai'i State Ethics Commission Executive Director Daniel J. Mollway, prohibits state employees from allowing individuals to post political campaign materials in a state office [3] *See* majority opinion at 91, 170 P.3d at 342; *see also id.* at 102, 170 P.3d at 353. I therefore agree with the majority that the

---

**2.** HRS § 84–13, entitled "Fair treatment," provides in relevant part that "[n]o legislator or employee shall use or attempt to use the legislator's or employee's official position to secure or grant unwarranted privileges, exemptions, advantages, contracts, or treatment, for oneself or others."

**3.** In his testimony before the agency-appellee Hawai'i Labor Relations Board (the HLRB), Director Mollway explained his analysis of HRS § 84–13 in the present matter:

[I]f you're asking[,] can ... a union person who is not a State employee over which we

DOT employees acted reasonably by restricting the HGEA's posting of campaign materials on the DOT's bulletin board. *Id.* at 76, 170 P.3d at 327.

### II. *THE HLRB DID NOT IMPOSE AN UNCONSTITUTIONAL CONDITION OF EMPLOYMENT ON ARVID YOUNGQUIST.*

The majority also does not address the HGEA's argument that the HLRB imposed an "unconstitutional condition of employment upon Arvid Youngquist, as an employee of [the DOT]." The HGEA maintains that HRS § 84–13, *see supra* note 2, "as construed and applied to Youngquist [by the HLRB,] imposes upon a public employee a requirement that he relinquish his right to post union bulletin board notices critical of his employer," the respondent-appellee Governor Linda Lingle. According to the HGEA, that right is grounded in the first amendment.

### A. *The HGEA Reasonably Raised The Unconstitutional Conditions Issue In Its First Point Of Error.*

The majority asserts that the HGEA's unconstitutional conditions argument was never raised as a point of error on appeal, because the HGEA failed "to clearly identify the issue as a point of appeal," citing HRAP Rule 28(b)(4). Majority opinion at 91 n. 23, 170 P.3d at 342 n. 23. The rule does not, however, say that an issue must be *"clearly* identiff[ied]," *id.* (emphasis added). Instead, HRAP Rule 28(b)(4) provides that an opening brief must contain:

A concise statement of the points of error set forth in separately numbered paragraphs. Each point shall state: (i) the

---

have no jurisdiction walk into the office and put something on the bulletin board, ... we would say that that would be inappropriate because that person would not ... be allowed on the premises or be allowed to do that without the permission of a State official or employee in the department.

And so in that particular case ... basically an outsider, so to speak, would not be able to do that. If we told the State employee or State official they can't do that, they certainly can't allow other people to come in and do that.

alleged error committed by the court or agency; (ii) where in the record the alleged error occurred; and (iii) where in the record the alleged error was objected to or the manner in which the alleged error was brought to the attention of the court or agency. Where applicable, each point shall also include the following:

. . . .

(C) when the point involves a finding or conclusion of the court or agency, a quotation of the finding or conclusion urged as error;

. . . .

Points not presented in accordance with this section will be disregarded, except that the appellate court, at its option, may notice a plain error not presented.

Thus, as a textual matter, I do not believe that the rule calls for an issue to be *clearly* identified and, absent such language, believe that it suffices for an issue to be *reasonably* identified in a point of error. Indeed, the majority's clear identification standard, *see* majority opinion at 91 n. 23, 170 P.3d at 342 n. 23, would be unadvisable because it would, consistent with the plain language of the rule, require this court to disregard all points of error that are anything less than clear and further require this court to notice plain error in order to address such points, *see* HRAP Rule 28(b)(4). Accordingly, in my view, an issue is properly raised under HRAP Rule 28(b)(4) when this court can at least reasonably identify the issue within a point of error.

In its first point of error, the HGEA asserts that the circuit court "erred by upholding a State ban on election & campaign postings on an authorized union bulletin board which abridges the right of 'free speech' guaranteed to government employees." The HGEA advanced its unconstitutional conditions argument—which it asserts is grounded in the right to freedom of speech—in the circuit court,[4] and the circuit court implicitly rejected this contention in its ruling, which

the HGEA quotes at length in its first point of error. To be sure, the HGEA does not assert as a separate point of error that the circuit court erred in concluding that a government employee's right to freedom of speech was violated specifically by virtue of the unconstitutional conditions doctrine. It does, nevertheless, generally contend that the right was violated, and further explains, in the argument section of its opening brief correlating to its first point of error, that one of the bases for that alleged violation is the unconstitutional conditions doctrine. Accordingly, I believe that the HGEA's unconstitutional conditions argument is fairly subsumed within its first point of error.

B. *Youngquist's Employment Was Not Unconstitutionally Conditioned Upon His Relinquishment Of His Right To Freedom Of Speech.*

Turning to the merits, the unconstitutional conditions doctrine provides that:

[E]ven though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited.

*Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *see also Rumsfeld v. Forum for Academic & Institutional Rights*, 547 U.S. 47, 59, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006).

The HGEA's argument that Youngquist was required to forgo his right[5] to post the campaign materials on the bulletin board, presupposes that he had that right in the

---

**4.** In fact, the HGEA first raised the unconstitutional conditions issue before the HLRB.

**5.** The right to freedom of speech is guaranteed by the first amendment to the United States Constitution, which applies to the states through

the fourteenth amendment, *Virginia v. Black*, 538 U.S. 343, 358, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003), and by article I, section 4 of the Hawai'i Constitution.

first instance, which, as the majority correctly explains in sections IV–VIII of its opinion, he did not. *See* majority opinion at 84–92, 170 P.3d at 335–43. Simply put, Youngquist had no right that the DOT forced him to relinquish and, consequently, the HLRB could not have imposed an unconstitutional condition of employment upon him. *See Legal Aid Soc. of Hawaii v. Legal Servs. Corp.,* 145 F.3d 1017, 1024–27 (9th Cir.1998) (holding that a federal statute and its implementing regulations, which required that legal aid organizations receiving federal funds not use those funds for certain restricted activities, did not unconstitutionally condition the provision of funding to the organizations upon the relinquishment of a first amendment right, because the statute did not forbid the organizations from using non-federal funds to engage in the restricted activities through separate entities); *Libertarian Party of Ind. v. Packard,* 741 F.2d 981, 988–90 (7th Cir.1984) (concluding that a state scheme, which gave a portion of personalized license plate revenues to political parties based on the percentage of the vote the parties captured, did not condition the availability of a public benefit (obtaining the license plate) on the surrender of the plaintiff's first amendment rights, inasmuch as the state's provision of public funds to qualifying political parties did not offend those rights).